T.C. Memo. 2000-38

UNITED STATES TAX COURT

ANTHONY W. JORGENSON AND FLORENCE A. JORGENSON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5041-98.              Filed February 7, 2000.

<u>Edward E. Hartline</u>, for petitioners.

<u>Susan K. Greene</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined the following
deficiencies in and penalties on petitioners' Federal income
taxes:

|  | | Accuracy-Related Penalty |
| Tax Year | Deficiency | Sec. 6662(a) |
| 1992 | $46,954 | $9,391 |
| 1993 | 99,939 | 19,988 |
| 1994 | 112,241 | 22,448 |

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions,[1] the issues for decision are: (1) Whether petitioners' ranching and farming activities constituted activities engaged in for profit under section 183, and if so, whether petitioners substantiated claimed expenses from the activities;[2] (2) whether petitioners are entitled to deduct certain expenses associated with a rental property located in St. John, U.S. Virgin Islands (the St. John rental property); (3) whether petitioners may deduct two noncash charitable contributions; and (4) whether petitioners are liable for accuracy-related penalties pursuant to section 6662(a).

---

[1] Petitioners concede the Schedule E deductions associated with rental properties in Nacogdoches, Texas, for the 1993 and 1994 taxable years. Petitioners also concede various Schedule E deductions associated with a rental property in St. John, U.S. Virgin Islands (the St. John rental property), for the 1992 and 1993 taxable years. Respondent concedes that certain taxes reported on petitioners' Schedule E with regard to the St. John rental property are proper itemized deductions under sec. 63(d). Respondent allowed only certain of petitioners' cash charitable contributions. For the 1992, 1993, and 1994 taxable years, petitioners failed to argue in their petition, at trial, and in their posttrial briefs that they were entitled to cash charitable contributions in excess of the amount allowed by respondent. We therefore find that petitioners concede this issue. See Petzoldt v. Commissioner, 92 T.C. 661, 683 (1989). Furthermore, respondent concedes that petitioners did not underreport their interest income on their 1992, 1993, and 1994 tax returns.

[2] Although it is unclear from the notice of deficiency, we assume respondent would deny, for lack of substantiation, only those expenses in excess of the income from the activities; i.e., the losses from the activities.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, and the attached exhibits are incorporated herein by this reference. At the time they filed their petition, petitioners resided in Nacogdoches, Texas.

Petitioners both practice medicine. During the years in issue, Mr. Jorgenson worked full time as an orthopedic surgeon, while Mrs. Jorgenson practiced full time as a radiologist.

Together, petitioners reported the following amounts as wages and partnership income from their medical practices during the years in issue:

|  | Petitioners' Wages and Partnership Income |
| Taxable Year | From Medical Practices |
| 1992 | $982,004 |
| 1993 | 865,193 |
| 1994 | 839,715 |

Petitioners were raised in rural communities. Mr. Jorgenson grew up on a 400-acre farm in Minnesota. On the Minnesota farm, Mr. Jorgenson's parents maintained dairy and beef cattle, hogs, and chickens. In addition, Mr. Jorgenson's father planted corn and soybeans. Mr. Jorgenson's father gave him part of the family's calves, which he raised and eventually sold. Mrs. Jorgenson was born on a 750-acre ranch near Austin, Texas. On the farm, her father raised various crops. Her father also gave

her various calves to manage and sell.  At age 16, she left her father's Texas ranch and used the proceeds from the sale of her calves for her college and medical school education.

In late 1976, after serving in the U.S. Army, petitioners settled in Nacogdoches, Texas.  Subsequent to arriving in Nacogdoches, petitioners purchased three ranches and one farm.

Melrose Ranch

In 1978, petitioners purchased 80 acres of land situated 6 miles east of Nacogdoches, Texas (Melrose ranch), for $105,000.  The Melrose ranch sits adjacent to petitioners' current residence near Nacogdoches, Texas.  During the years in issue, petitioners rented out their current residence.  Because of the Melrose ranch's small size, petitioners could not effectively conduct a ranching or farming operation on it.  During the taxable years in issue, petitioners did not maintain any cattle on the Melrose ranch.

Chireno Ranch

In 1979, petitioners purchased 510 acres of land in Chireno, Texas (Chireno ranch), which is 25 miles east of Nacogdoches, for $325,000.  When petitioners purchased the Chireno ranch, the ranch contained minimal improvements.  Petitioners constructed additional cattle pens, a pole barn, and a small metal shed.  In 1992, petitioners built a one-vehicle bridge over a canal on the Chireno ranch.

Initially, petitioners, together with Mr. Jorgenson's

elderly father, raised crossbred cattle. In the early 1980's, petitioners decided to breed purebred cattle and purchased a registered purebred Black Brangus herd (Brangus herd) consisting of 110 head of cattle. Between 1986 and 1989, as part of their effort to breed purebred cattle, petitioners entered into an artificial insemination program for their cattle.

Petitioners failed to make a profit on the purebred cattle operation. In June 1989, petitioners sold their Brangus herd, dismissed their ranch manager, and ceased the purebred cattle operation on the Chireno ranch.

In 1991, petitioners decided again to raise crossbred cattle. In September 1991, petitioners received 51 steers from the Colorado ranch, see infra Colorado ranch, and maintained these steers on the Chireno ranch. This number of steers was far below the Chireno ranch's capacity. Sometime between September 1991 and January 1992, petitioners' Chireno ranch manager was killed in a propane explosion. On January 11, 1992, because petitioners had not hired a new ranch manager and they were maintaining full-time medical practices, they sold the steers.

During the rest of 1992, 1993, and 1994, petitioners did not raise, purchase, or maintain any cattle on the Chireno ranch. During that time period, Elzie Smith (Mr. Smith), who had bailed hay prior to 1992 on the Chireno ranch for petitioners, performed general maintenance work on the Chireno ranch in addition to bailing hay. He maintained the fences and cared for the pastures

of the Chireno ranch.  Mr. Smith did not maintain written records with regard to the number of hours he cared for the Chireno ranch.  Petitioners compensated Mr. Smith for his services by providing him with part of the bailed hay.  In addition to his work at the Chireno ranch, Mr. Smith worked for a local cable company installing cable and operated a ranch in Nacogdoches.

Colorado Ranch

In 1983, petitioners purchased 1,200 acres of land, 10 miles east of Guffey, Colorado (Colorado ranch), for $550,000.  The Colorado ranch includes a house and a barn.

On the Colorado ranch, the growing season lasts only 30 to 60 days during a normal year.  The grazing season lasts only 90 days.  Because of this short grazing season, the Colorado ranch can only serve as a summer steer or heifer operation.

In 1984, severe rains caused a major flood on the Colorado ranch.  As a result of the flood, the hay meadows and the grasses on the Colorado ranch were severely damaged.  To maintain revenue from the sale of hay and to provide any steers and heifers on the Colorado ranch with fields on which to graze, petitioners had to reestablish the hay meadows and the grasses.

From 1984 to 1993, petitioners participated in a Government-sponsored conservation program to replant the hay meadows and the grasses.  Under the terms of the conservation program, petitioners could not graze cattle on several sections of the Colorado ranch during the replanting period.  The replanting

effort extended until 1993 partly due to the short growing season at the Colorado ranch.

Generally, petitioners have to purchase steers or heifers around June 1 and maintain them at the Colorado ranch until September 1 when petitioners have to move or sell them. In the summer of 1991, petitioners purchased and maintained 51 steers, which were subsequently moved to the Chireno ranch, on the Colorado ranch. In 1992, the Colorado ranch was not used as a summer steer or heifer operation.

In 1992, petitioners increased the size of the Colorado ranch by purchasing 640 adjoining acres of land at a cost of $101,000. Also, in 1992, petitioners hired Calvin Hunt to make major improvements to the Colorado ranch. The improvements included repairing dams, removing debris, and restoring the irrigation systems to the hay meadows. During 1992, 1993, and 1994, petitioners hired Donald and Tina Higgenbotham on a part-time basis to maintain the Colorado ranch. The Higgenbothams' duties included establishing and maintaining the hay meadows and seeding and mowing the grasses of the Colorado ranch.[3] After all the replanting efforts and improvements, the Colorado ranch had improved hay meadows and restored grasses.

In 1993, petitioners acquired an additional 200 adjoining acres for $42,000. During 1993, petitioners maintained a small

---

[3] In addition, Donald Higgenbotham performed services for petitioners on petitioners' ranches in Texas and rental properties.

number of steers on the Colorado ranch.[4]  In 1994, petitioners purchased for the Colorado ranch a very limited amount of cattle which they subsequently sold in late 1994.

Kerrville Farm

In 1993, petitioners purchased 100 acres of land in Kerrville, Texas (Kerrville farm), for $275,000.  Petitioners purchased the Kerrville farm with the intent of retiring and harvesting pecans on the Kerrville farm.

Petitioners constructed two houses on the Kerrville farm; i.e., a large and beautiful residence for themselves (retirement home) and a small home for their part-time caretaker. Construction on their retirement home began in 1993 and concluded in 1994.  During those years, petitioners cleared the land of cedar and rocks, leveled the land, and made various other improvements.  In 1994, petitioners purchased six longhorn steers, which could not be bred, for $4,000 and placed them on the Kerrville farm.  In 1995, 1 year after the years in issue, petitioners planted their first pecan trees on the Kerrville farm.  Normally, a pecan operation becomes profitable 7 to 10 years after the planting of the pecan trees.

Petitioners did not maintain any business records such as budgets, operating statements, written business plans, or financial projections with regard to the ranching and farming

---

[4]  The record does not establish whether petitioners sold or retained the steers that they maintained on the Colorado ranch in 1993.

activities on the four properties (collectively, the Melrose, Chireno, and Colorado ranches and the Kerrville farm are referred to as the four properties). Also, petitioners failed to maintain logs or journals with regard to their participation in the activities on the four properties. Petitioners, however, did consult with local government conservation agencies about how best to restore and improve the four properties.

Throughout their ownership of the four properties, petitioners reported losses. Specifically, for the years 1986 to 1994, petitioners incurred losses (excluding depreciation deductions) totaling $1,284,349. As for the years in issue, petitioners claimed the following losses with regard to the ranching and farming activities:

| Taxable Year | Ranching and Farming Losses |
|---|---|
| 1992 | $122,893 |
| 1993 | 205,331 |
| 1994 | 261,469 |

Rental Properties

In February 1992, petitioners purchased the St. John rental property for $375,000. In December 1992, petitioners transferred a one-half interest in the St. John rental property to the Jorgenson Family Credit Shelter Trust (the Trust). On their 1994 tax return, petitioners reported $149,230 in expenses with regard to the St. John rental property on Schedule E. On the notice of deficiency, respondent determined that petitioners and the Trust

had substantiated expenses of $64,397 with regard to the St. John rental property for the 1994 taxable year. Respondent determined that of the $64,397 expenses allowed to petitioners and the Trust, petitioners were entitled to deduct only one-half. Respondent disallowed the rest of the deductions claimed by petitioners for lack of substantiation. During the years in issue, in addition to the St. John rental property, petitioners maintained several other rental properties in Nacogdoches, Texas, for which they claimed various tax deductions.

Charitable Contributions

In 1993 and 1994, petitioners made noncash charitable contributions to two qualified charitable organizations as described in section 170(c)(1). In 1993, petitioners donated a sliding wall partition (partition) having a fair market value of $10,000 to the Boys and Girls Club of Nacogdoches (the Club). In 1994, petitioners donated a 1989 Chevrolet Suburban (Suburban) having a fair market value of $14,850 to the Sacred Heart Catholic Church.

The Internal Revenue Service (IRS) provides taxpayers with Form 8283 to report information related to noncash charitable contributions on their tax returns. In their 1993 tax return, petitioners attached the second page of Form 8283 and a letter from the executive director of the Club to petitioners thanking them for the partition. On the second page of Form 8283, petitioners described the partition as a "Sliding Partition Wall"

in "Good" condition with an appraised fair market value of "$10,000". Further, on the second page of Form 8283, petitioners stated that they had acquired the partition by purchase, that they had a $10,000 adjusted basis in the partition, and that they claimed a $10,000 deduction with regard to the partition. In their 1994 tax return, petitioners failed to include Form 8283. Petitioners incorrectly claimed the noncash charitable contribution of the Suburban as a $14,850 cash charitable contribution.

Petitioners also failed to obtain qualified appraisals, as defined by section 1.170A-13(c)(3), Income Tax Regs., for both charitable contributions prior to the due date of their 1993 and 1994 tax returns. On audit, petitioners provided the IRS with letters drafted (after petitioners filed their tax returns) by two appraisers.

OPINION

I. Ranching and Farming Activities

Section 183(a) provides generally that, if an activity is not engaged in for profit, no deduction attributable to such activity shall be allowed except as provided in section 183(b).[5]

---

[5] In the case of an activity not engaged in for profit, sec. 183(b)(1) allows a deduction for expenses that are otherwise deductible without regard to whether the activity is engaged in for profit. Sec. 183(b)(2) allows a deduction for expenses that would be deductible only if the activity were engaged in for profit, but only to the extent that the total gross income derived from the activity exceeds the deductions allowed under sec. 183(b)(1).

Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

For a deduction to be allowed under section 162 or section 212(1) or (2), a taxpayer must establish that he or she engaged in an activity with an actual and honest objective of making an economic profit independent of tax savings. See Antonides v. Commissioner, 91 T.C. 686, 693-694 (1988), affd. 893 F.2d 656 (4th Cir. 1990); Dreicer v. Commissioner, 78 T.C. 642, 644-645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The expectation of profit need not have been reasonable; however, the taxpayer must have entered into the activity, or continued it, with the objective of making a profit. See Hulter v. Commissioner, 91 T.C. 371, 393 (1988); sec. 1.183-2(a), Income Tax Regs.

Whether the requisite profit objective exists is determined by looking at all the surrounding facts and circumstances. See Keanini v. Commissioner, 94 T.C. 41, 46 (1990); sec. 1.183-2(b), Income Tax Regs. Greater weight is given to objective facts than to a taxpayer's mere after-the-fact statement of intent. See Westbrook v. Commissioner, 68 F.3d 868, 875-876 (5th Cir. 1995), affg. T.C. Memo. 1993-634; sec. 1.183-2(a), Income Tax Regs. The taxpayer bears the burden of proving that he engaged in the activity with the intent to make a profit. See Rule 142(a).

Section 1.183-2(b), Income Tax Regs., provides a list of factors to be considered in the evaluation of a taxpayer's profit objective:  (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, from the activity; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation.  This list is nonexclusive, the number of factors for or against the taxpayer is not necessarily determinative, and more weight may be given to some factors than to others.  Cf. <u>Dunn v. Commissioner</u>, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980); sec. 1.183-2(b), Income Tax Regs.

Petitioners contend that because the activities were profit motivated they properly reported losses from the ranching and farming activities.  Conversely, respondent asserts that the activities were not engaged in for profit.  We agree with respondent.[6]

---

[6]  On Schedule F of their tax returns, petitioners reported the ranching and farming activities on the four properties as one activity.  In their briefs, petitioners seem to argue that the ranching and farming activities on the four properties are one activity.  Respondent argues that we should treat each property

A.  Manner in Which the Activity Is Conducted

The fact that a taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate a profit objective.  See sec. 1.183-2(b)(1), Income Tax Regs.  Petitioners presented the Court with voluminous receipts, invoices, and canceled checks allegedly evidencing expenditures for the four properties.  After reviewing the evidence, we cannot determine whether the expenditures were exclusively for the benefit of the four properties (instead of the rental properties) and which expenditures, if any, related to which specific ranch or farm.

The parties also stipulate that petitioners did not prepare any budget or operating statements.  Further, the parties stipulate that petitioners did not create a written business plan or any financial projections.  Petitioners conducted their activities unaware of the amount of revenue they could reasonably generate and had no credible estimate of the costs associated with the four properties.

We conclude that petitioners did not conduct the ranching

---

as a separate activity.  In order to ascertain whether petitioners have conducted separate activities, we must evaluate all the facts and circumstances of the case.  See sec. 1.183-1(d)(1), Income Tax Regs.  Although we find that the ranching and farming activities on the four properties are one activity, we note that the outcome of this case would have been the same had we concluded that petitioners maintained separate activities on each of the four properties or two activities (one for ranching and one for farming).

and farming activities in a businesslike manner.[7]

B.  Expertise of Petitioners and their Advisors

A taxpayer's expertise, research, and study of an activity, as well as his consultation with experts, may be indicative of a profit motive.  See sec. 1.183-2(b)(2), Income Tax Regs.  Growing up, petitioners acquired experience in raising and maintaining a limited number of cattle but not in running an entire ranching and farming operation.

Petitioners, however, hired ranch managers for their ranches and sought advice from local Government conservation agencies with regard to maintaining the four properties.  These facts indicate that petitioners had a profit motive.

C.  Time and Effort Expended by the Taxpayer

Because of their busy medical practices, petitioners devoted a very limited time to their ranching and farming activities.  A taxpayer, however, can show a profit motive if he has employed competent and qualified persons to carry on the activity.  See sec. 1.183-2(b)(3), Income Tax Regs.  In the instant case, petitioners employed various people to maintain and care for their four properties.  Petitioners' actions indicate a profit motive.

---

[7]  Sec. 1.183-2(b)(1), Income Tax Regs., provides that abandonment of unprofitable methods may indicate a profit motive. Petitioners argue that when they abandoned their purebred cattle operation in 1989, they attempted to limit their losses. Although we find some merit in petitioners' argument, it does not affect our overall conclusion that for the years in issue petitioners did not conduct the ranching and farming activities in a businesslike manner.

D.  The Expectation That Assets May Appreciate in Value

An expectation that assets may appreciate in value may also be an indication of the taxpayer's motive with respect to such activity.  See sec. 1.183-2(b)(4), Income Tax Regs.  Petitioners contend that the appreciation in the value of their four properties more than offsets petitioners' historical losses.  Mr. Jorgenson testified that the appreciation on the four properties exceeded the historical losses and that the Colorado ranch could be sold for more than the amount of the historical losses.  Mr. Jorgenson, however, failed to explain to the Court how he knows his claims to be true.  We note with regard to the Colorado ranch, for example, petitioners purchased land in 1983 for $458 an acre ($550,000 ÷ 1,200 acres), while in 1992, they purchased adjoining land for $158 an acre ($101,000 ÷ 640 acres).  Because no appraisals of the four properties were presented to the Court, we do not accept petitioners' uncorroborated claims.  Accordingly, this factor does not support petitioners' assertions.

E.  The Success of the Taxpayer in Carrying on Other
    Similar or Dissimilar Activities

A profit motive may be indicated by the "fact that a taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises".  Sec. 1.183-2(b)(5), Income Tax Regs.  Petitioners argue that they profitably operated cattle operations on their parents' ranches and that they have successfully operated their medical practices.

We do not equate petitioners' childhood experiences of caring for a limited amount of cattle with the responsibility associated with running an entire ranching and farming operation. Further, petitioners' experiences in the medical field do not meaningfully translate into their ranching and farming operations. See Wesinger v. Commissioner, T.C. Memo. 1999-372; Wilkinson v. Commissioner, T.C. Memo. 1996-39. Accordingly, this factor also does not support petitioners' position.

F. The Activity's History of Income or Losses and Amount of Occasional Profits (If Any)

A record of substantial losses over several years may be indicative of the absence of a profit motive. See Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without opinion 647 F.2d 170 (9th Cir. 1981). Petitioners have incurred losses throughout their ownership of the four properties, with $1,284,349 being incurred between 1986 and 1994. Petitioners have never earned any profits from the ranching and farming activities.

Petitioners argue that they incurred losses from normal startup costs and from unusual market and economic conditions. Further, petitioners contend that part of their losses can also be explained by dramatic weather conditions that affected their Colorado ranch.

We are unpersuaded. Although the Court recognizes that pecan operations do not immediately become profitable, petitioners purchased the Kerrville ranch in 1993, but they did

not plant the first pecan trees until 1995 when their retirement home was completed. Further, petitioners failed to show that had events beyond their control not occurred their ranches would have been profitable. Accordingly, these factors weigh against petitioners.

G. The Taxpayer's Financial Status

Substantial income from sources other than the activity in question, particularly if the activity's losses generate substantial tax benefits, may indicate that the activity is not engaged in for profit. See sec. 1.183-2(b)(8), Income Tax Regs. Petitioners generated significant income from their medical practices which enabled them to afford the upkeep on the four properties. This factor indicates a lack of profit objective.

H. Personal Pleasure

The absence of personal pleasure or recreation relating to the activity in question may indicate the presence of a profit objective. See sec. 1.183-2(b)(9), Income Tax Regs. In the case of ranching activities, however, because personal enjoyment can coexist with demanding physical labor, this factor does "little to advance or detract from [petitioners'] position." Wesinger v. Commissioner, T.C. Memo. 1999-372. As to petitioners' farming activity, we note that petitioners constructed a large and beautiful retirement home at the Kerrville ranch in the heart of the Texas hill country. At a minimum, we find that this factor does not advance petitioners' argument that they conducted their ranching and farming activities with a profit motive.

## I. Conclusion

After reviewing the entire record,[8] we conclude that petitioners did not engage in the ranching and farming activities with an actual and honest objective of making a profit within the meaning of section 183.[9]  Because we dispose of the section 183 issue against petitioners, we need not reach respondent's alternative argument that petitioners have failed to substantiate the claimed expenses which resulted in losses for the ranching and farming activities.

## II. St. John Rental Property Expenses

On their 1994 tax return, petitioners deducted $149,230 of expenses with regard to the St. John rental property.  On the notice of deficiency, respondent determined that petitioners and the Trust had substantiated expenses in the amount of $64,937, of which petitioners could deduct one-half.[10]  Petitioners bear the burden of proof with regard to the claimed deductions.  See Rule

---

[8]  Petitioners submitted an expert report by Stephen J. Kleberg, which opined, among other things, that petitioners conducted their ranching and farming operations in a businesslike manner.  We found Mr. Kleberg's report and testimony to be of no assistance in deciding this case.  In light of the fact that Mr. Kleberg visited only the Melrose and Chireno ranches and did not evaluate petitioners' limited books and records, his testimony was implausible or questionable.

[9]  We have evaluated various facts and circumstances subsequent to the years in issue.  See Taube v. Commissioner, 88 T.C. 464, 482 (1987).  These facts and circumstances do not affect our conclusion that petitioners did not have a profit motive during the years in issue.

[10]  Since the issuance of the notice of deficiency, respondent has made several concessions affecting the $64,937 in expenses.

142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).

Petitioners argue that they are entitled to a $149,230 deduction because (1) petitioners and the Trust had an oral agreement to operate as a partnership with regard to the St. John rental property, (2) pursuant to the oral partnership agreement, the partner who paid for an expense of the St. John rental property was entitled to the corresponding tax deduction, and (3) petitioners paid for expenses (including depreciation) in the amount of $149,230.

Because petitioners have failed to provide any credible evidence of the existence of a partnership or a partnership agreement and have failed to substantiate the deductions, we sustain respondent's determination.

III. <u>Charitable Contributions</u>

Section 170(a)(1) provides that a taxpayer may deduct "any charitable contribution * * * payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary." The Secretary of the Treasury (Secretary) has issued section 1.170A-13, Income Tax Regs., to implement Congress' legislative mandate. Section 1.170A-13(c), Income Tax Regs, provides that the taxpayer must obtain a qualified appraisal for donated property (except money and certain publicly traded securities) in excess of $5,000.[11]

_____

[11] Sec. 1.170A-13(c)(3), Income Tax Regs., describes the necessary requirements for a qualified appraisal.

In addition, the Secretary requires that the taxpayer attach an appraisal summary to the tax return. See sec. 1.170A-13(c)(2)(i)(B), Income Tax Regs. The Secretary has listed in section 1.170A-13(c)(4)(i) and (ii), Income Tax Regs., the items to be included by the taxpayer in the appraisal summary. The IRS has prescribed Form 8283 to be used as the appraisal summary.

Although we have not demanded that the taxpayer strictly comply with the reporting requirements of section 1.170A-13, Income Tax Regs., we have required that the taxpayer substantially comply with the Treasury regulations in order to take the deduction for a charitable contribution. See Hewitt v. Commissioner, 109 T.C. 258 (1997), affd. 166 F.3d 332 (4th Cir. 1998). Based on the record, we find that petitioners did not timely obtain qualified appraisals and failed to include complete appraisal summaries with their 1993 and 1994 tax returns. Because petitioners failed to comply substantially with section 1.170A-13, Income Tax Regs., we hold that petitioners are not entitled to deduct the noncash charitable contributions.

IV. Section 6662(a) Accuracy-Related Penalties

Pursuant to section 6662(a), for each of the years in issue, respondent determined an accuracy-related penalty of 20 percent on the amount of the underpayment attributable to a substantial understatement of tax. In the alternative, respondent imposed the accuracy-related penalties on the amount of the underpayment due to negligence or disregard of rules or regulations. Respondent's determinations are presumed to be correct, and

petitioners bear the burden of proving that the accuracy-related penalties do not apply. See Rule 142(a).

A substantial understatement of tax is defined as an understatement of tax that exceeds the greater of 10 percent of the tax required to be shown on the tax return or $5,000. See sec. 6662(d)(1)(A). The understatement is reduced to the extent that the taxpayer has (1) adequately disclosed his or her position or (2) has substantial authority for the tax treatment of the item. See sec. 6662(d)(2)(B). Section 6662(c) defines "negligence" as any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code, and "disregard" means any careless, reckless, or intentional disregard.

Whether applied based on a substantial understatement of tax or negligence or disregard of the rules or regulations, the accuracy-related penalty is not imposed with respect to any portion of the understatement as to which the taxpayer acted with reasonable cause and in good faith. See sec. 6664(c)(1). The decision as to whether the taxpayer acted with reasonable cause and in good faith depends upon all the pertinent facts and circumstances. See sec. 1.6664-4(b)(1), Income Tax Regs. Relevant factors include the taxpayer's efforts to assess his proper tax liability, including the taxpayer's reasonable and good-faith reliance on the advice of a professional such as an accountant. See sec. 1.6664-4(b)(1), Income Tax Regs. Further, an honest misunderstanding of fact or law that is reasonable in

light of the experience, knowledge, and education of the taxpayer may indicate reasonable cause and good faith. See <u>Remy v. Commissioner</u>, T.C. Memo. 1997-72.

Petitioners assert that they acted with reasonable cause and in good faith when they reported the ranching and farming losses, the St. John rental property expenses, and the noncash charitable contributions. The determination of whether petitioners engaged in their ranching and farming activities for profit involves a difficult factual question. See, e.g., <u>Wesinger v. Commissioner</u>, T.C. Memo. 1999-372; <u>Arrington v. Commissioner</u>, T.C. Memo. 1983-673. Petitioners maintained various receipts, invoices, and canceled checks for their claimed expenses and employed an accountant to prepare their tax returns and advise them. Their accountant testified at trial that he represented other ranchers and farmers in Texas and that petitioners provided him enough information to report their ranching and farming activities. We are not persuaded that their reliance on the accountant was less than reasonable. Accordingly, we find that petitioners acted with reasonable cause and in good faith, and, therefore, the accuracy-related penalties attributable to the losses from the ranching and farming activities do not apply.

Petitioners, however, have failed to provide a reasonable explanation why we should not sustain the accuracy-related penalties with regard to the deductions of the St. John rental

property expenses and the noncash charitable contributions. Petitioners provided no credible evidence for the claimed St. John rental property deductions.  Further, neither petitioners nor their accountant provided an explanation why timely qualified appraisals were not conducted for the noncash charitable contributions and why the appraisal summaries on Form 8283 were not fully completed.  We, therefore, sustain respondent's imposition of the accuracy-related penalties with regard to the underpayment associated with the deductions of the St. John rental property expenses and the noncash charitable contributions.

In reaching our holdings herein, we have considered all arguments made by the parties, and to the extent not mentioned above, we find them to be irrelevant or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.