T.C. Memo. 2018-164

UNITED STATES TAX COURT

MARC CHREM AND ESTHER CHREM, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 23516-16, 23517-16,       Filed September 26, 2018.
        25417-16, 25418-16,
        25419-16, 25420-16,
        25421-16, 25422-16,
        25423-16, 25424-16,
        25425-16.

Brian B. Snarr and Michael Craig Weinstein, for petitioners.

Patrick F. Gallagher, Rose E. Gole, and Gennady Zilberman, for respondent.

---

[1]Cases of the following petitioners are consolidated herewith: Jacqueline Ashkenazi, docket No. 23517-16; Albert Ashkenazi, docket No. 25417-16; David I. Ashkenazi and Linda Yedid, docket No. 25418-16; Ely I. Ashkenazi and Paulina Ashkenazi, docket No. 25419-16; Isaac E. Ashkenazi, docket No. 25420-16; Jack E. Ashkenazi, docket No. 25421-16; Joseph E. Betesh and Sally Ashkenazi, docket No. 25422-16; Saul E. Ashkenazi and Pauline J. Salame, docket No. 25423-16; Mark Chraime and Barbara Chraime, docket No. 25424-16; and Ralph Gindi and Grace Gindi, docket No. 25425-16.

[*2]                    MEMORANDUM OPINION


LAUBER, Judge:  These consolidated cases are before the Court on the par-

ties' cross-motions for partial summary judgment.  Petitioners (along with eight

other individuals or couples) owned 100% of the stock of Comtrad Trading, Ltd.

(Comtrad), a closely held Hong Kong corporation.  A related company proposed to

purchase 100% of Comtrad's stock for $4,500 per share.  After Comtrad's share-

holders agreed to tender about 87% of their shares, petitioners donated the balance

of their stock to a charitable organization.  The acquiring company then completed

the acquisition, purchasing the donated stock for $4,500 per share.

On their 2012 Federal income tax returns, petitioners claimed charitable

contribution deductions for their gifts, valuing the donated stock at $4,500 per

share.  In timely notices of deficiency the Internal Revenue Service (IRS or

respondent) determined that petitioners were liable for tax under the assignment of

income doctrine on their transfers of stock to the charity.  The IRS also determined

that petitioners had failed to obtain and (where applicable) attach to their returns

"qualified appraisals" of the donated property.  See sec. 170(f)(11)(C) and (D).[2]

_____

[2]All statutory references are to the Internal Revenue Code (Code) in effect
for the year in issue, and all Rule references are to the Tax Court Rules of Practice
and Procedure.  We round all monetary amounts to the nearest dollar.

**[*3]** Petitioners seek summary judgment with respect to the first determination, and the parties have filed cross-motions for summary judgment with respect to the second pair of determinations. Concluding that material disputes of fact exist, we will deny all the motions.

Background

The following facts are drawn from the parties' pleadings, motion papers, and the declarations and exhibits attached thereto. These facts are stated solely for purposes of ruling on the pending motions for summary judgment, not as findings of fact in these cases. See Rule 1(b); Fed. R. Civ. P. 52(a); Cook v. Commissioner, 115 T.C. 15, 16 (2000), aff'd, 269 F.3d 854 (7th Cir. 2001). All petitioners resided in New York when they filed their petitions.

Formed in August 2001, Comtrad was a Hong Kong corporation that did business in Hong Kong and Shenzhen, China. As of October 2012 it had 7,000 shares of outstanding common stock, 5,425 of which were owned by petitioners. Eight other individuals or couples, some of whom appear to have family ties to petitioners, owned the remaining 1,575 shares.

Comtrad performed testing and quality control services for three related companies that produced and marketed consumer electronic products. Comtrad selected suppliers, took title to component parts manufactured by those suppliers,

**[\*4]** performed testing on those components to verify specifications and ensure quality, and managed the logistics of delivering the components to its customers. Comtrad received for its services commissions ranging between 3.5% and 8%, computed as markups on its total costs.

Comtrad's principal customer was SDI Technologies, Inc. (SDI), which manufactured and marketed a broad range of consumer electronic products, including clock radios, home audio systems, headphones, and computer accessories. SDI accounted for 83% of Comtrad's revenue and 76% of its gross profit in 2011.

SDI is a U.S. corporation that elected to be treated as an S corporation for Federal income tax purposes. Virtually all of SDI's stock was owned during 2012 by an employee stock ownership plan (ESOP).[3] Petitioners and other Comtrad shareholders appear to have been beneficiaries of the ESOP. SDI and Comtrad were also related through common management. A majority of each company's board of directors served as directors for both companies.

In late 2012 SDI made a proposal to acquire 100% of Comtrad's stock. The stated purposes of this acquisition were: (1) to recapture for SDI the commissions

---

[3]An ESOP is a tax-exempt plan that invests primarily in the securities of its sponsoring employer. See Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. No. 93-406, sec. 2003(e)(7), 88 Stat. at 976 (codified as amended at sec. 4975(e)(7)).

[*5] it had been paying Comtrad, (2) to achieve greater vertical integration and control over product sourcing in Asia, (3) to give SDI control of certain trademarks held by Comtrad, and (4) to "take advantage of the favorable tax treatment that would be afforded Comtrad's net earnings due to SDI's status as an S corporation" whose shares were owned by an ESOP.

It was proposed that the stock acquisition would proceed in two steps. SDI would first purchase 6,100 Comtrad shares from petitioners and the other Comtrad shareholders. The proposed purchase price was $4,500 per share, for a total of $27,450,000. The consideration paid by SDI for this tranche was to consist of $450,000 in cash and $27 million in subordinated 15-year promissory notes bearing 8% annual interest.

The second step involved the remaining 900 shares of Comtrad's outstanding stock. In connection with SDI's acquisition of the 6,100 shares, petitioners agreed to donate 900 shares to the Jewish Communal Fund (JCF), an organization exempt from Federal income tax under section 501(a) and (c)(3). SDI agreed to purchase each share tendered by JCF for $4,500 in cash.

Petitioners agreed, after donating their shares to JCF, "to use all reasonable efforts" to cause JCF to tender the 900 shares to SDI. If the donors failed to persuade JCF to do this, it was expected that SDI would use a "squeeze-out merger, a

**[*6]** reverse stock split or such other action that will result in SDI owning 100% of

* * * Comtrad." If SDI failed to secure ownership of JCF's shares within 60 days

of acquiring the 6,100 shares, the entire acquisition would be reversed out and SDI

would return the 6,100 shares to the tendering Comtrad shareholders.

As noted above, virtually all (99.9%) of SDI's shares were owned by an

ESOP. Because SDI and Comtrad were related parties, the trustee for the ESOP

believed that ERISA[4] required it to secure a fairness opinion to ensure that SDI

paid no more than "adequate consideration" for the Comtrad stock. See 29 U.S.C.

secs. 1106(a) (generally prohibiting transactions between ERISA plans and parties

in interest), 1108(b)(17)(A) (permitting such transactions if the plan pays no more

than "adequate consideration"), 1002(18)(B) (defining adequate consideration by

reference to "the fair market value * * * as determined in good faith by the trustee"

in accordance with regulations promulgated by the Secretary of Labor).

The ESOP trustee hired Empire Consultants, LLC (Empire), to provide a

fairness opinion supported by a valuation report. In describing the proposed trans-

action, Empire expressed its understanding that SDI would acquire 100% of Com-

trad's stock "in two stages." "The first stage," according to Empire, "involves the

---

[4]ERISA is an acronym for the Employee Retirement Income Security Act of 1974, Pub. L. No. 93-406, 88 Stat. 829 (codified as amended at various sections of 29 U.S.C. (2012)).

[*7] acquisition of 6,100 shares, or approximately 87.1%, of Comtrad's outstanding ordinary shares," for $27,450,000 in cash and promissory notes. "Simultaneously with SDI's acquisition of the 6,100 shares," Empire stated, "certain of Comtrad's shareholders will transfer 900 shares" to JCF. "The second stage of the Proposed Transaction involves the acquisition of the JCF shares for $4,500 per share or $4.05 million in aggregate."

Using regulatory guidelines and professional standards that it deemed relevant,[5] Empire provided its estimate of the fair market value (FMV) of "100% of the ordinary shares of Comtrad * * *." It employed a market approach and a discounted cashflow approach, and it applied a 5% downward adjustment to reflect a discount for lack of marketability.[6] It concluded that the FMV of Comtrad, "valued on a going concern basis," was between $29.5 million and $32.4 million, or $4,214 to $4,626 per share.

Empire submitted its findings to the ESOP trustee in a "restricted use appraisal report" dated December 8, 2012, and a fairness opinion dated December 10, 2012 (collectively, Empire report). Given the range of FMVs it determined for

[5] Empire stated that it performed its appraisal according to guidelines set by the Department of Labor, the IRS, and the American Society of Appraisers.

[6] In explaining this relatively small discount, Empire "note[d] that the appropriate level of discount is materially less on a control block than it would be on a minority interest block."

[*8] Comtrad, Empire opined that the proposed transaction was fair to the beneficiaries of SDI's ESOP. Empire emphasized that its report was for the "the sole use of * * * [the ESOP trustee] in its fiduciary capacity" and could "not be used for any other purpose or by any other user(s) without the express consent of Empire." Empire expressly stated that its appraisal "does not take into consideration any tax consequences related to Comtrad's selling shareholders."

On December 12, 2012, two days after the date of Empire's fairness opinion, SDI purchased 6,100 shares of Comtrad stock from petitioners and the other Comtrad shareholders. The parties dispute when petitioners donated their 900 shares to JCF; petitioners assert that these donations occurred on December 5, whereas respondent contends that they occurred no earlier than December 10, allegedly after JCF unconditionally agreed to sell the 900 shares to SDI. But the parties agree that JCF formally tendered its 900 shares to SDI on December 12, the same day on which the other Comtrad shareholders tendered their shares. And the parties agree that JCF received the same per-share price, $4,500, that the other Comtrad shareholders received, but that JCF was paid entirely in cash.

All petitioners timely filed (sometimes jointly) Forms 1040, U.S. Individual Income Tax Return, for 2012. On their respective Schedules A,

**[*9]** Itemized Deductions, petitioners claimed noncash charitable contributions for the stock they donated to JCF, as follows:

| Petitioner(s) | Docket No. | Shares contributed | Claimed deduction |
|---|---|---|---|
| Marc Chrem & Esther Chrem | 23516-16 | 45 | $202,500 |
| Jacqueline Ashkenazi | 23517-16 | 45 | 202,500 |
| Albert Ashkenazi | 25417-16 | 125 | 562,500 |
| David I. Ashkenazi & Linda Yedid | 25418-16 | 90 | 405,000 |
| Ely I. Ashkenazi & Paulina Ashkenazi | 25419-16 | 90 | 405,000 |
| Isaac E. Ashkenazi | 25420-16 | 125 | 562,500 |
| Jack E. Ashkenazi | 25421-16 | 125 | 562,500 |
| Joseph E. Betesh & Sally Ashkenazi | 25422-16 | 35 | 157,500 |
| Saul E. Ashkenazi & Pauline J. Salame | 25423-16 | 125 | 562,500 |
| Mark Chraime & Barbara Chraime | 25424-16 | 50 | 225,000 |
| Ralph Gindi & Grace Gindi | 25425-16 | 45 | 202,500 |
| Total | | 900 | 4,050,000 |

When a taxpayer makes a charitable contribution of property (other than publicly traded securities) valued in excess of $5,000, he is required to secure a "qualified appraisal." Sec. 170(f)(11)(C). If he claims a value in excess of $500,000 for such property, he is required to attach a copy of the appraisal to his

[*10] return.  Sec. 170(f)(11)(D).  None of petitioners secured for their contributions, or attached to their returns, an appraisal that was addressed to them.

However, each of petitioners' returns included an "appraisal summary" on Form 8283, Noncash Charitable Contributions.  In Part I of these forms, captioned "Information on Donated Property," petitioners noted the number of Comtrad shares that each had donated.  They stated that they had acquired those shares by purchase and supplied their respective cost bases for the donated shares.  Gregory Sullivan, the managing director of Empire who had signed the fairness opinion issued to the ESOP trustee, signed the "Declaration of Appraiser" on each Form 8283.  Saul Wadowski, an officer of JCF, signed the "Donee Acknowledgment" on each form, which listed December 5, 2012, as the date on which JCF had received the donated stock.

The IRS selected all of petitioners' returns for examination and requested that they supply qualified appraisals to substantiate their claimed deductions.  In response each petitioner supplied a copy of the report that Empire had prepared for the ESOP trustee.  The IRS issued notices of deficiency to all petitioners, determining that they were liable for tax under the anticipatory assignment of income doctrine on their transfers of shares to JCF.  The IRS also disallowed in full the claimed charitable contribution deductions for failure to satisfy the

[*11] requirements of section 170(f)(11).  Finally, the IRS determined that petitioners were liable for 20% accuracy-related penalties under section 6662(a) and, in the alternative, 40% "gross valuation misstatement" penalties under section 6662(h).

Petitioners timely petitioned this Court for redetermination.  On February 1, 2017, the Court consolidated the 11 cases for purposes of trial, briefing, and opinion.  On March 8, 2018, respondent filed his motion for partial summary judgment.  Petitioners filed their cross-motion one week later.

Discussion

I.    Summary Judgment Standard

The purpose of summary judgment is to expedite litigation and avoid costly, time-consuming, and unnecessary trials.  Fla. Peach Corp. v. Commissioner, 90 T.C. 678, 681 (1988).  Under Rule 121(b), we may grant summary judgment when there is no genuine dispute as to any material fact and a decision may be rendered as a matter of law.  Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), aff'd, 17 F.3d 965 (7th Cir. 1994).  In deciding whether to grant summary judgment, we construe factual materials and inferences drawn from them in the light most favorable to the nonmoving party.  Id.; see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  However, the nonmoving party may not rest upon the

[*12] mere allegations or denials in his pleadings but instead must set forth specific facts showing that there is a genuine dispute for trial. Rule 121(d); see Sundstrand Corp., 98 T.C. at 520.

II.  Assignment of Income

Petitioners seek summary judgment on respondent's application of the assignment of income doctrine to their donations of stock. A longstanding principle of tax law is that income is taxed to the person who earns it. United States v. Basye, 410 U.S. 441, 450 (1973) ("[H]e who earns income may not avoid taxation through anticipatory arrangements no matter how clever or subtle[.]"). Thus, a person anticipating receipt of income "cannot avoid taxation by entering into a contractual arrangement whereby that income is diverted to some other person." Id. at 449 (citing Lucas v. Earl, 281 U.S. 111, 115 (1930)).

This Court has previously considered the assignment of income doctrine as applied to charitable contributions. In the typical scenario, the taxpayer donates to a charity stock that is about to be acquired by the issuing corporation via redemption, or by another corporation via merger or acquisition. In determining whether the taxpayer has assigned income in these circumstances, one relevant question is whether the prospective acquisition is a mere expectation or a virtual certainty. "More than expectation or anticipation of income is required before the

**[*13]** assignment of income doctrine applies." Greene v. United States, 13 F.3d 577, 582 (2d Cir. 1994).[7]

Another relevant question is whether the charity is obligated, or can be compelled by one of the parties to the transaction, to surrender the donated shares to the acquirer. Rev. Rul. 78-197, 1978-1 C.B. 83 (1978); see Rauenhorst v. Commissioner, 119 T.C. 157, 166 (2002) (finding "the donee's control to be * * * an important factor"). The existence of an "understanding" among the parties, or the fact that transactions occur simultaneously or according to prearranged steps, may be relevant in answering that question. See, e.g., Blake v. Commissioner, 697 F.2d 473, 480 (2d Cir. 1982) (stating that an "understanding" among the parties need not be "legally enforceable under state law"), aff'g T.C. Memo. 1981-579; Ferguson v. Commissioner, 108 T.C. 244 (1997) (finding assignment of income with respect to proceeds of merger that occurred contemporaneously with charitable contribution), aff'd, 174 F.3d 997 (9th Cir. 1999).

---

[7]Compare, e.g., Palmer v. Commissioner, 62 T.C. 684, 695 (1974) (finding no assignment of income where stock was transferred before corporation had voted to redeem it), aff'd, 523 F.2d 1308 (8th Cir. 1975), with Ferguson v. Commissioner, 174 F.3d 997, 1006 (9th Cir. 1999) (finding an assignment of income where stock was donated after tender offer had effectively been completed and it was "most unlikely" that the offer would be rejected), aff'g 108 T.C. 244 (1997), and Hudspeth v. United States, 471 F.2d 275, 279 (8th Cir. 1972) (finding an assignment of income where stock was donated after shareholders had voted and taken steps to liquidate the corporation).

**[*14]** We conclude that there exist genuine disputes of material fact that prevent us from resolving the assignment of income issue summarily. Comtrad and SDI were related by common management, the interests of both companies appear to have been aligned, and both companies seemingly desired that the stock acquisition be completed. If so, these facts may support the conclusion that the acquisition was virtually certain to occur. Respondent also points to emails and an alleged exchange of documents between JCF and petitioners on November 12, 2012. This evidence may support respondent's contention that JCF agreed in advance to tender its shares to SDI and that all steps of the transaction were prearranged.

The parties also dispute the dates on which relevant events occurred. Petitioners assert that they transferred their shares to JCF on December 5 and there appears to be documentary evidence arguably supporting that assertion. Respondent contends that JCF did not acquire ownership of its 900 shares until (at the earliest) December 10, allegedly after JCF unconditionally agreed to sell the 900 shares to SDI. That contention derives arguable support from other documentary evidence, as well as from Empire's description of the proposed transaction, which recited that petitioners would transfer 900 shares to JCF "[s]imultaneously with SDI's acquisition of the 6,100 shares."

[*15] There are also genuine disputes of material fact concerning the extent to which JCF, having received the 900 shares, was obligated to tender them to SDI. Empire stated in its report that petitioners would use "all reasonable efforts to cause * * * [JCF] to agree to sell the shares to SDI." At this juncture the record includes little if any evidence concerning petitioners' ability to sway JCF's actions or JCF's separate negotiations (if any) with SDI. Respondent contends that JCF had no meaningful discussions with SDI at all but was "simply informed by petitioners" that the 900 shares should be tendered at once. A trial will be necessary to determine whose version of the facts is correct.

One fact potentially relevant to this question concerns JCF's fiduciary duties as a custodian of charitable assets. If JCF tendered its Comtrad shares, it would immediately receive $4,050,000 in cash. If it refused to tender its shares and the entire transaction were scuttled, JCF would apparently be left holding a 13% minority interest in a closely held Hong Kong corporation, the market value of which might be questionable.

In sum, viewing the facts and the inferences that might be drawn from the facts in the light most favorable to respondent as the nonmoving party, we find that there exist genuine disputes of material fact that prevent summary

[*16] adjudication of the assignment of income issue. To the extent petitioners seek summary judgment on this question, we will deny their motion.

III.  Charitable Contribution Deductions

A.  Governing Legal Framework

Section 170(a)(1) allows as a deduction any charitable contribution made within the taxable year. If the taxpayer makes a charitable contribution of property other than money, the amount of the contribution is generally equal to the FMV of the property when contributed. See sec. 1.170A-1(c)(1), Income Tax Regs. "A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary." Sec. 170(a)(1).

The Secretary has prescribed extensive regulations governing verification of charitable contributions. See sec. 1.170A-13, Income Tax Regs. A taxpayer who claims a deduction for a contribution of property (other than publicly traded securities) valued in excess of $5,000 must obtain a "qualified appraisal" of the property. Sec. 170(f)(11)(C). He must also attach to his return "such information regarding such property and such appraisal as the Secretary may require," which includes a fully completed appraisal summary on Form 8283. Id.; see Jorgenson v. Commissioner, T.C. Memo. 2000-38, 79 T.C.M. (CCH) 1444, 1450; sec. 1.170A-13(c)(2), Income Tax Regs. When a contribution of property is valued in excess of

**[*17]** $500,000 the taxpayer must attach a copy of that appraisal to his return. Sec. 170(f)(11)(D). This last requirement applies to the four petitioners who claimed charitable contribution deductions of $562,500. See supra p. 9.

Section 170(f)(11)(E)(i) defines "qualified appraisal" to mean an appraisal performed by a qualified appraiser that "is treated for purposes of this paragraph as a qualified appraisal under regulations or other guidance prescribed by the Secretary." The regulations prescribed by the Secretary require that a "qualified appraisal" include (among other things) the following: (1) "[a] description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was (or will be) contributed," (2) a "statement that the appraisal was prepared for income tax purposes," (3) "[t]he date (or expected date) of contribution to the donee," (4) "[t]he date (or dates) on which the property was appraised," and (5) "[t]he appraised fair market value * * * of the property." Sec. 1.170A-13(c)(3)(ii), Income Tax Regs.

In Bond v. Commissioner, 100 T.C. 32, 41 (1993), we held that the regulatory reporting requirements listed above, while "helpful to respondent in the processing and auditing of returns on which charitable deductions are claimed," are "directory and not mandatory." Thus, in appropriate circumstances, these require-

[*18] ments can be satisfied by substantial, rather than literal, compliance. Id. at 42; see Hewitt v. Commissioner, 109 T.C. 258, 265, n.10 (1997) (describing substantial compliance as satisfied where the taxpayer has "provided most of the information required" or made omissions "solely through inadvertence"), aff'd without published opinion, 166 F.3d 332 (4th Cir. 1998). While substantial compliance may excuse minor, technical, or merely procedural defects, it offers no relief to taxpayers who have failed to disclose information that goes to "the essential requirements of the governing statute." Estate of Evenchik v. Commissioner, T.C. Memo. 2013-34, 105 T.C.M. (CCH) 1231, 1234 (quoting Estate of Clause v. Commissioner, 122 T.C. 115, 122 (2004)).

Section 170(f)(11)(A)(ii)(II) excuses failure to satisfy the reporting require-ments discussed above if it is shown that such failure "is due to reasonable cause and not to willful neglect." The formulation of this defense--requiring the existence of "reasonable cause" and the absence of "willful neglect"--resembles that appearing in numerous Code provisions that impose penalties or additions to tax. See, e.g., secs. 6039G(c)(2), 6704(c)(1), 6652(f)-(j), 6709(c); see also sec. 6664(c)(1) (requiring that the taxpayer have "reasonable cause" and have "acted in good faith"). Although section 170(f)(11)(A)(ii)(II) relieves the taxpayer from disallowance of a deduction rather than from imposition of a penalty, we have

**[*19]** construed the contours of these defenses similarly. See Alli v.

Commissioner, T.C. Memo. 2014-15, 107 T.C.M. (CCH) 1082, 1096; Crimi v.

Commissioner, T.C. Memo. 2013-51, 105 T.C.M. (CCH) 1330, 1353.

"Reasonable cause requires that the taxpayer have exercised ordinary busi-

ness care and prudence as to the challenged item." Crimi, 105 T.C.M. (CCH) at

1353 (citing United States v. Boyle, 469 U.S. 241 (1985)). "The determination of

whether a taxpayer acted with reasonable cause and in good faith is made on a

case-by-case basis, taking into account all pertinent facts and circumstances." Sec.

1.6664-4(b)(1), Income Tax Regs. Reasonable cause may be shown by

establishing reliance on the advice of a tax professional. But such "advice must

generally be from a competent and independent advisor unburdened with a

conflict of interest and not from promoters of the investment." Mortensen v.

Commissioner, 440 F.3d 375, 387 (6th Cir. 2006), aff'g T.C. Memo. 2004-279.

B.     Analysis

While not challenging Empire's status as a "qualified appraiser," respondent

urges that petitioners have failed, in two respects, to satisfy the regulatory

reporting requirements. Respondent first contends that the Empire report does not

constitute a "qualified appraisal." Even if it is a "qualified appraisal," respondent

contends that those petitioners who donated stock valued in excess of $500,000

**[\*20]** are entitled to no deductions because they did not attach copies of that appraisal to their tax returns as section 170(f)(11)(D) requires. Petitioners contend that they substantially complied with all of the regulatory reporting requirements or, in the alternative, that they had reasonable cause for failing to do so.

As respondent observes, the Empire report in several respects fits awkwardly with the appraisal reporting requirements. For starters, it is not addressed to petitioners, it does not examine any charitable contributions of property, it does not set forth the "date (or expected date) of the contribution," and it does not include a statement that it "was prepared for income tax purposes." See sec. 1.170A-13(c)(3)(ii), Income Tax Regs. Quite the contrary: The report explicitly states that it was prepared for ERISA compliance purposes, that it was intended solely for the use of the ESOP trustee, and that it "d[id] not take into consideration any tax consequences related to Comtrad's selling shareholders."

Respondent further emphasizes that Empire did not value the specific property that each petitioner actually contributed. Petitioners individually donated to JCF between 35 and 125 shares of Comtrad stock. The largest block represented only 1.8% of Comtrad's 7,000 outstanding shares, and petitioners collectively donated fewer than 13% of its outstanding shares.

**[\*21]** But whereas petitioners contributed small minority interests, Empire valued Comtrad "on a going concern basis" and determined the value of "100% of the ordinary shares of Comtrad." In so doing Empire discharged the mission the ESOP trustee had entrusted to it, that is, to determine whether SDI's offering price of $4,500 was fair to the Comtrad shareholders. Since Empire was valuing the entire company, it correctly applied no minority discount. And while it applied a discount of 5% for lack of marketability, that adjustment was small because "the appropriate level of discount is materially less on a control block than it would be on a minority interest block." Had Empire been asked to value the minority interest block that each petitioner donated to JCF, Empire would obviously have written a very different sort of report.

When an appraisal values property different from that which was actually contributed to charity, that failure can be fatal because it "goes to the essence of the information required." Costello v. Commissioner, T.C. Memo. 2015-87, 109 T.C.M. (CCH) 1441, 1447 (holding that an appraisal was not "qualified" where it valued the wrong asset); Estate of Evenchik, 105 T.C.M. (CCH) at 1234 (holding that an appraisal was not "qualified" because it valued corporate assets, whereas the taxpayer had donated corporate stock). Citing cases such as these, respondent contends that petitioners neither strictly nor substantially complied with the regu-

[*22] latory reporting requirements because the Empire report valued the wrong asset and (for that reason) neglected to apply the discounts that should appropriately be applied when valuing minority stock interests.

Petitioners reply that this is a case of "no harm, no foul." SDI was offering to buy 100% of Comtrad's shares and to pay the same price ($4,500) for each share. That being so, petitioners say, all of Comtrad's shares had equal value, and there was no logical reason to apply a minority interest discount to the shares tendered by JCF. Indeed, because JCF received cash for its 900 shares, whereas the other Comtrad shareholders received mostly promissory notes, JCF's shares, as compared with those other shares, may arguably have justified a valuation premium rather than a discount.

For these reasons, petitioners urge that they substantially complied with the appraisal reporting requirements. Although Empire did not recite the analysis set forth in the preceding paragraph, it described the proposed transaction in detail and made clear that SDI was offering to buy each share tendered by JCF for $4,500 in cash. Under these circumstances, petitioners say, it would be obvious to any sophisticated reader that no minority discount was required, thus neutralizing respondent's argument that Empire valued the wrong property.

**[\*23]** Petitioners admit that the Empire report did not explicitly state that "the appraisal was prepared for income tax purposes." See sec. 1.170A-13(c)(3)(ii)(G), Income Tax Regs. But Empire allegedly followed IRS guidelines when doing its valuation, and the Empire professional who signed the appraisal also signed the Forms 8283 attached to petitioners' returns. Petitioners admit that the Empire report did not explicitly state "the date (or expected date) of contribution to the donee." Id. subdiv. (ii)(C). And while the parties dispute the exact date on which the contributions occurred, the Empire report makes clear that all relevant events occurred sometime between December 5 and 12, 2012. Petitioners contend that any technical shortcomings of the Empire report can thus be excused on grounds of substantial compliance.[8]

The four petitioners who made contributions valued in excess of $500,000 have a second hurdle to overcome. Section 170(f)(11)(D) required them, not only to get a qualified appraisal, but also to attach a copy of that appraisal to their 2012

---

[8]See, e.g., Zarlengo v. Commissioner, T.C. Memo 2014-161, 108 T.C.M. (CCH) 155, 163 (finding appraisal "qualified" where contribution dates were listed in the appraisal summary); Gorra v. Commissioner, T.C. Memo. 2013-254, 106 T.C.M. (CCH) 523, 533-534 (finding appraisal "qualified" where Commissioner could discern that the contribution was made during a specific month); Consol. Inv'rs. Grp. v. Commissioner, T.C. Memo. 2009-290, 98 T.C.M. (CCH) 601, 614 (finding appraisal "qualified" despite omission of any statement regarding income tax purpose); Simmons v. Commissioner, T.C. Memo. 2009-208, 98 T.C.M. (CCH) 211, 215-216 (finding appraisal "qualified" despite omission of an explicit statement regarding income tax purpose), aff'd, 646 F.3d 6 (D.C. Cir. 2011).

[*24] tax returns, which they did not do.  They say that they nevertheless "substantially complied" with this requirement by attaching to their return a fully completed Form 8283.  But the Code requires that a taxpayer in this position attach to his return <u>both</u> an appraisal summary <u>and</u> a copy of the appraisal itself.  <u>Compare</u> sec. 170(f)(11)(C), <u>with</u> <u>id.</u> subpara. (D).  When a statute separately requires that a taxpayer satisfy two requirements, it is not obvious that literal compliance with the first constitutes substantial compliance with the second.[9]

Even if petitioners did not strictly or substantially comply with the regulatory reporting requirements, they all seek haven in section 170(f)(11)(A)(ii)(II).  That provision excuses failure to satisfy the reporting requirements discussed above if it is shown that such failure "is due to reasonable cause and not to willful neglect."  Petitioners allege that their 2012 returns were prepared by an experienced certified public accountant (CPA), that they supplied her with the Empire report and all relevant information about the Comtrad stock acquisition, and that she did not direct any of petitioners to include a copy of the Empire report with

---

[9]Petitioners cite section 1.170A-13(c)(4)(iv)(H), Income Tax Regs., in support of their position.  That section provides possible relief where a donor, owing to "a good faith omission," fails to attach "an appraisal summary" to his return.  In that event the charitable contribution deduction will not be automatically denied if the taxpayer supplies a Form 8283 within 90 days of an IRS request therefor.  <u>Ibid.</u> But there is no comparable relief provision covering situations where the donor, having reported a value in excess of $500,000 for donated property, fails to attach to his return a copy of the appraisal itself.

**[\*25]** their returns. The record as it stands now is silent concerning the advice (if any) that the CPA provided petitioners regarding the Empire report and whether they relied in good faith on whatever advice she may have supplied. For these reasons, we conclude that petitioners' ability to rely on the "reasonable cause" defense of section 170(f)(11)(A)(ii)(II) presents genuine disputes of material fact that are not susceptible to resolution by summary judgment.

Barring settlement, these cases will need to go to trial on the assignment of income issue and on petitioners' entitlement to the "reasonable cause" defense. Under these circumstances we deem it prudent, for two reasons, to deny in their entirety both pending motions for partial summary judgment. First, if petitioners prevail on the "reasonable cause" defense, it will be unnecessary for us to decide whether they substantially complied with the appraisal reporting requirements.

Second, there could be some factual overlap between the two sets of issues. During trial of the assignment of income issue, we will need to determine (among other things) whether the prospective acquisition of Comtrad's stock was a mere expectation or a virtual certainty. See supra p. 13. The resolution of that factual question could affect whether petitioners substantially complied (or had reasonable cause for failing to comply) with the appraisal reporting requirements. That might be so (for example) if petitioners contend that they did not need to get

**[*26]** an appraisal at all, or were advised that they did not need to get an appraisal, because the value of the Comtrad stock was fixed at $4,500 per share by an offer from SDI that was certain to close.

To reflect the foregoing,

<u>An appropriate order will be issued</u>.