T.C. Memo. 2020-76

UNITED STATES TAX COURT

BRANNAN SAND & GRAVEL CO., LLC, J. CURTIS MARVEL, TAX
MATTERS PARTNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 27474-16.                    Filed June 4, 2020.

<u>Kevin A. Planegger</u>, for petitioner.

<u>Ruba Nasrallah</u>, for respondent.

MEMORANDUM OPINION

COHEN, <u>Judge</u>:  This case was fully stipulated and submitted to the Court

under Rule 122.  After concessions, the issue for decision is whether Brannan

Sand & Gravel Co., LLC (Brannan Sand), substantiated--as required under section

1.170A-13(c), Income Tax Regs.--a $200,000 charitable contribution claimed for

[*2] donation of certain water storage rights. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Background

All of the facts have been stipulated, and the stipulated facts are incorporated as our findings by this reference. When the petition was filed, Brannan Sand's principal place of business was in Colorado, and its tax matters partner J. Curtis Marvel resided in Colorado.

Brannan Sand is a Colorado limited liability company whose business consists of extracting rock, sand, and gravel from the ground and processing those materials into asphalt. The materials not made into asphalt are either used in paving operations or sold. Brannan Sand mined the sand and gravel deposits for its business from 157 acres it owned in Adams County, Colorado (property).

Bromley District Water Providers, L.L.C. (Bromley), is a Colorado limited liability company. Silver Peaks Metropolitan District No. 1 (District) is a political subdivision of the State of Colorado to which contributions made for exclusively public purposes are treated as charitable contributions under section 170.

**[*3]** History of the Transactions

In 2003, Brannan Sand planned to mine sand and gravel deposits on the property for the next 10 to 20 years. It aimed to mine these deposits in at least two separate mining cells: the North Cell and the South Cell. Brannan Sand planned to mine these cells in a manner to allow construction of slurry cell lining with lined embankments above so that they could be used as water storage reservoirs. Bromley and the District needed lined water storage near the Property. Brannan Sand entered into an Agreement to Buy and Sell Real Estate and Option (buy and sell agreement) on January 21, 2003, with Bromley. On the same date Brannan Sand entered into a Contribution Agreement (contribution agreement) with Bromley and the District.

As described in the buy and sell agreement, Brannan Sand sold the property to Bromley but reserved certain mineral rights and water rights and a perpetual and exclusive easement for the purpose of creating water storage rights (water storage easement). The water storage easement was defined in the buy and sell agreement as a "perpetual, exclusive easement in, over, across, on, and under the Property for the purpose of creating and/or using any space in, over, across, on, and under the Property for the storage of water, and any and all water storage rights and rights to store water associated therewith without interference from the fee owner of the

[*4] Property." Brannan Sand also reserved the right to construct lined embankments above the slurry lining of the North and South Cells for the purpose of increasing the water storage capacity.

The objectives of the buy and sell agreement and the contribution agreement were the development of water storage on the property after Brannan Sand completed its mining activities. At the time of the sale Bromley was planning to construct a nonpotable pipeline from the purchased property to a point south of Barr Lake. Bromley agreed to construct slurry walls in a manner to allow mining in the North and South Cells separately so that the two cells could be completed as two isolated water storage reservoirs. The water storage that would be available in the South Cell was estimated to be 1,900 acre-feet, and the water storage that would be available in the North Cell was estimated to be 3,196 acre-feet.

Brannan Sand agreed to convey to Bromley an option to purchase an additional undivided interest in the reserved water storage space and water storage right easement as the space became physically available. In the contribution agreement Bromley also agreed to purchase from Brannan Sand a conditional right to "Takedown B Property" and "Takedown C Property". Takedown B Property consisted of an undivided interest in the reserved Water Storage Easement, which entitled Bromley to "no less than 1,000 acre-feet of water storage space in, over,

**[*5]** across, on, and under the Property for the storage of water." Takedown C Property consisted of an additional 833 acre-feet for the storage of water. If Bromley did not complete the acquisition of the Takedown B Property or failed satisfactorily to complete the Takedown B Property requirements specified in the buy and sell agreement, Brannan Sand was relieved of any obligation to contribute any water storage easement rights to the District. If Bromley fully performed its obligations related to the Takedown B Property but failed to close on the Takedown C Property, then Brannan would be relieved of its water storage easement contribution obligation related to the Takedown C Property only.

Brannan Sand agreed to contribute to the District an undivided interest equivalent to 20% of the water storage easement purchased by Bromley in consideration of the agreement that Bromley would donate at least $10,000 in water, water rights, or other assets to the District. The District would be entitled to use this space in, over, across, on, and under the Property for water storage. Brannan Sand would be obligated to deliver possession of the water storage space at the same time it was required to deliver possession of the related Takedown B and Takedown C Properties to Bromley.

On November 24, 2004, Brannan Sand and Bromley entered into the First Amendment to the Agreement to Buy and Sell Real Estate and Option, which

[*6] amended the original buy and sell agreement. Brannan Sand, Bromley, and the District entered into the First Amendment to the Contribution Agreement that amended the original contribution agreement. Brannan Sand was supposed to deliver possession of the South Cell on October 15, 2006, and the North Cell on December 31, 2012. Brannan Sand, Bromley, and the District had estimated that the available water storage would be 1,900 acre-feet in the South Cell and 3,196 acre-feet in the North Cell. The parties agreed that any delay in delivery of possession was subject to a penalty of $100 per day from the specified delivery dates to the dates of actual delivery. The economic downturn in 2008 and 2009 especially affected the construction industry. Brannan Sand did not deliver the cells as agreed.

Brannan Sand completed the South Cell with an actual water storage capacity of 1,098 acre-feet and delivered it to Bromley on September 1, 2010. As of October 2010 the estimated water storage capacity of the North Cell was revised down to 2,082 acre-feet, and Brannan Sands had neither completed nor delivered possession of it to Bromley. Bromley claimed that it had sustained damages exceeding $1 million as a result of the delay and that Brannan Sand had benefited financially by at least $490,000 from Bromley's decision to enlarge the South Cell with construction of dams. Brannan Sand disagreed with these

[*7] assertions and claimed that the partnership had not materially benefited from Bromley's decision to enlarge the South Cell and that Bromley was partially responsible for the delay in completing the South Cell. (The record is silent regarding whether Bromley's enlargement of the South Cell impacted the actual water storage capacity.)

The parties desired to resolve the issues that arose from the late delivery of the South Cell. In a Memorandum of Understanding Regarding Pit 29 (MOU) dated October 26, 2010, Brannan Sand agreed to sell to Bromley an additional undivided interest in the water storage easement that allowed an additional 250 acre-feet of water storage in the North Cell. Bromley agreed to pay $480,000 for the additional water storage easement. Also in the MOU, Brannan Sand agreed to contribute to the District an additional undivided interest in the water storage easement that would allow for an additional 50 acre-feet of water storage in the North Cell. Brannan Sand and Bromley agreed to close on the deal for the additional undivided interest in the water storage easement within 30 days and that Brannan Sand would deliver possession of the North Cell no later than June 30, 2013.

[*8] The 2010 Partnership Return

On September 19, 2011, Brannan Sand filed a Form 1065, U.S. Return of Partnership Income, for 2010. Form 8283, Noncash Charitable Contributions, was attached without "Page 1" but included two "Page 2" pages. The second "Page 2" includes a handwritten note to "see attached appraisal" under part III, declaration of appraiser, and an undated donee signature under part IV, donee acknowledgment. The two copies of "Page 2" are otherwise identical. Brannan Sand claimed a $200,000 charitable contribution deduction. The Form 8283 reported that the "[d]onor's cost or adjusted basis"was "None", that $200,000 was the appraised fair market value, and that the donor purchased the property. The reported "[d]escription of donated property" was "Silver Peaks Property". The Form 8283 reported "VAR" for the date acquired and left blank whether the charitable contribution was made by means of a bargain sale.

In part III, declaration of appraiser, the signature, title, date, identifying number, city, State, and ZIP Code spaces were left blank, but "See attached appraisal" was inserted under the business address section. In part IV, donee acknowledgment, the employer identification number, authorized signature, and date spaces were left blank. However, there is a signature in the "[t]itle"space.

**[*9]** Two pages attached to the Form 8283 are a letter dated August 30, 2011, signed by Timothy J. Flanagan. Flanagan explains in this letter that petitioner's attorney had asked him to update his prior valuation opinions of September 7, 2005, and January 9, 2008. Flangan states that his 2011 letter has to be read with prior valuation opinions in 2005 and 2008, neither of which was attached to the Form 8283. Flanagan mentions but does not otherwise describe in his 2011 letter a transaction regarding unrelated parties in which water storage acre-feet were priced in excess of $3,650 per acre-foot. The letter states that Flanagan is "quite comfortable" with the opinion that the "Brannan Pit" would be worth between $3,500 and $4,000 per acre-foot. Flanagan concludes that despite the economic downturn, it is his "view that 50 acre-feet of storage at this location, if sold on the open market to a knowledgeable purchaser for immediate delivery would be worth at least $4,000 per acre-foot or $200,000 for the 50-acre transaction."

In his September 7, 2005, letter Flanagan stated: "I am not a licensed real estate appraiser under either Colorado or Federal law. I hold no real estate nor appraisal designations but am familiar with many gravel mines that have been converted into water storage vessels because of my representations of a number of companies in the aggregate industry." Flanagan based his opinion on his

[*10] experience as a litigator and that he was "aware" of a number of properties with asking prices indicating a price per acre-foot of $3,500 to $4,000.

Missing from the 2011 Flanagan letter was the method of valuation or the specific basis for determining the fair market value of the property, the physical condition of the property, or a statement that the purported appraisal was prepared for Federal income tax purposes. There was no explanation comparing the transactions that he observed with the property in the Brannan Sands transactions. Flanagan gave no indication that he was familiar with the terms of the purchase agreement, the contribution agreement, or the MOU entered into by the donor, the donee, and Bromley relating to the conveyance of the property contributed. There was no comparison to the alleged comparables or explanation of whether they involved a willing buyer and a willing seller or were simply a way to resolve litigated disputes. There was no justification for choosing the high end of the range that Flanagan identified.

The partnership returns for 2010 and 2011 were examined by the Internal Revenue Service. A separate notice of final partnership administrative adjustment (FPAA) for each year was sent on September 20, 2016. In addition to adjustments now resolved by a stipulation of settled issues, the FPAA for 2010 determined that the $200,000 charitable contribution deduction claimed on the 2010 return failed

**[*11]** to qualify as an allowable deduction under section 170 or any other section of the Internal Revenue Code.

Discussion

Brannan Sands has the burden of proving that it satisfies all requirements for the deduction claimed. See Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). The most important fact regarding a charitable contribution of property is the fair market value of the property at the time of the contribution. Sec. 1.170A-1(c)(1), Income Tax Regs.

Notably missing from the stipulated facts is any reliable evidence that the water storage easement that Brannan Sands contributed to the District had a fair market value of $200,000 or anything near that amount as of the date of the contribution. The 2011 Flanagan letter is only in evidence as an attachment to the return. We cannot consider opinions, even of a qualified appraiser, that are not received in evidence as proof of fair market value. See Van Der Aa Invs., Inc. v. Commissioner, 125 T.C. 1, 6-7 (2005) (indicating than an appraisal report would be inadmissible as evidence of fair market value if the author did not testify and make himself available for cross-examination); Evans v. Commissioner, T.C. Memo. 2010-207 (and cases cited therein). The Court therefore issued an order

**[\*12]** citing Rule 122(b) (submission of a case under Rule 122 does not alter the burden of proof or the effect of failure of proof) and Rule 149(b) (failure to produce evidence in support of an issue of fact as to which a party has the burden of proof may be ground for determination of that issue against that party).

Brannan Sands does not dispute that it has the burden of proof but ignores the absence of expert testimony in the record. Instead, it argues that the "comparable sale" of an additional undivided interest in the water storage easement that entitled Bromley to store an additional 250 acre-feet of water in the North Cell when completed for $480,000, or $1,920 per acre-foot, justifies, at a minimum, a value of $96,000. Of course there is no explanation of the discrepancy between this amount and the amount claimed on the 2010 partnership return. That discrepancy highlights the lack of credibility of the claimed deduction.

The parties' briefs, however, focus on the specific requirements applicable to the allowance of a deduction for a charitable contribution of property and whether Brannan Sands properly substantiated the deduction regardless of value. Those requirements have been described in numerous opinions, including recently in <u>Oakhill Woods, LLC v. Commissioner</u>, T.C. Memo. 2020-24, at \*11, as follows:

**[*13]**     Where a contribution of property (other than publicly traded securities) is valued in excess of $5,000, the taxpayer must "obtain[] a qualified appraisal of such property and attach[] to the return * * * such information regarding such property and such appraisal as the Secretary may require." Sec. 170(f)(11)(c). The required information includes "an appraisal summary" that must be attached "to the return on which such deduction is first claimed for such contribution." Deficit Reduction Act of 1984 (DEFRA), Pub. L. No. 98-369, sec. 155(a)(1), 98 Stat. at 691; see sec. 1.170A-13(c)(2), Income Tax Regs. The IRS has prescribed Form 8283 to be used as the "appraisal summary." Jorgenson v. Commissioner, T.C. Memo. 2000-38, 79 T.C.M. (CCH) 1444, 1450. Failure to comply with this requirement generally precludes a deduction. See sec. 170(a)(1) ("A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary."). [Alterations in original.]

In both Oakhill Woods and its similar predecessor, Belair Woods, LLC v. Commissioner, T.C. Memo. 2018-159, partial summary judgment was granted in favor of the Commissioner because of a single omission from the Form 8283 appraisal summary, that is, the donor's basis in the property. In this case respondent identifies, as shown in the stipulated exhibits, multiple omissions in the purported appraisal and in the Form 8283.

Section 1.170A-13(c)(3)(ii), Income Tax Regs., requires a qualified appraisal to include the following information:

(A) A description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was (or will be) contributed;

**[\*14]**       (B) In the case of tangible property, the physical condition of the property;

(C) The date (or expected date) of contribution to the donee;

(D) The terms of any agreement or understanding entered into (or expected to be entered into) by or on behalf of the donor or donee that relates to the use, sale, or other disposition of the property contributed * * *

\*       \*       \*       \*       \*       \*       \*

(E) The name, address, and * * * identifying number of the qualified appraiser * * *

(F) The qualifications of the qualified appraiser who signs the appraisal, including the appraiser's background, experience, education, and membership, if any, in professional appraisal associations;

(G) A statement that the appraisal was prepared for income tax purposes;

(H) The date (or dates) on which the property was appraised;

(I) The appraised fair market value (within the meaning of § 1.170A-1(c)(2)) of the property on the date (or expected date) of contribution;

(J) The method of valuation used to determine the fair market value, such as the income approach, the market-data approach, and the replacement-cost-less-depreciation approach; and

(K) The specific basis for the valuation, such as specific comparable sales transactions or statistical sampling, including a justification for using sampling and an explanation of the sampling procedure employed.

**[*15]** This Court has held that no deduction is allowed for noncash charitable contributions greater than $5,000 unless the requirements of a qualified appraisal are met. See, e.g., Hewitt v. Commissioner, 109 T.C. 258, 265-266 (1997), aff'd without published opinion, 166 F.3d 332 (4th Cir. 1998). Section 1.170A-13(c)(3)(i)(B), Income Tax Regs., defines the term "qualified appraisal" as a document that is prepared, signed, and dated by a qualified appraiser within the meaning of section 1.170A-13(c)(5) Income Tax Regs. Section 1.170A-13(c)(5)(i)(A) and (B), Income Tax Regs., states that a qualified appraiser is someone who either holds himself or herself out to the public as an appraiser or performs appraisals regularly, and because of the appraiser's qualifications as described in the appraisal, the appraiser is qualified to make appraisals of the type of property valued. Failure to comply with these requirements generally results in no deduction's being allowed for the contribution. Sec. 170(a)(1); sec. 1.170A-13(c)(1)(i), Income Tax Regs. ("No deduction under section 170 shall be allowed * * * unless the substantiation requirements described in paragraph (c)(2) of this section are met.").

Respondent contends that Flanagan's statement in his 2005 letter shows that he neither holds himself out to the public as an appraiser nor performs appraisals regularly. We agree. Moreover, even if Flanagan were qualified with respect to

[*16] valuation of water storage rights, his purported appraisal would not be reliable because of the many omitted pieces of information required in a qualified appraisal. Expert opinions that disregard relevant facts affecting valuation are rejected. See Boltar, L.L.C. v. Commissioner, 136 T.C. 326, 335 (2011); Estate of Newhouse v. Commissioner, 94 T.C. 193, 244 (1990); Estate of Hall v. Commissioner, 92 T.C. 312, 338 (1989). Perhaps Flanagan could have been qualified to give an opinion of value if he had explained how his experience in litigation related to agreed values between a willing buyer and a willing seller and compared the three-party circumstances under which the transfer to the District occurred in this case, but he did not. He described asking prices but did not describe completed transactions. The purported appraisal is not qualified regardless of Flanagan's qualifications.

With respect to the requirements of Form 8283, respondent points out that the partnership return included only the second page of the prescribed form and that the items left blank or not adequately explained were: (1) a description of the donated property; (2) the date acquired by the donor (month and year); (3) the donor's cost or adjusted basis; (4) whether the charitable contribution was made by means of a bargain sale, (5) part III, declaration of the appraiser; (6) the taxpayer identification number of the donee (employer identification number of

[*17] the District); and (7) the donee representative's title and the date signed.

Although the parties dispute whether the insertion of "none" for basis was

equivalent to the omission of basis altogether in Oakhill Woods and Belair Woods,

the multiple omissions in Brannan Sands' Form 8283 make it unnecessary to

resolve that single dispute. Brannan Sands did not strictly comply with the

regulation.

Brannan Sands seeks relief from its failure to comply strictly with the

regulation's requirements for a qualified appraisal under the doctrine of substantial

compliance. As recently set forth in Oakhill Woods, LLC v. Commissioner,

at *15-*16:

> In Bond v. Commissioner, 100 T.C. 32, 41 (1993), we held that
> some of the reporting requirements in section 1.170A-13, Income Tax
> Regs., while "helpful to respondent in the processing and auditing of
> returns," are "directory and not mandatory." Thus, in appropriate
> circumstances, these requirements can be satisfied by substantial,
> rather than by literal, compliance. Bond, 100 T.C. at 42. "The
> doctrine of substantial compliance is designed to avoid hardship in
> cases where a taxpayer does all that is reasonably possible, but
> nonetheless fails to comply with the specific requirements of a
> provision." Durden v. Commissioner, T.C. Memo. 2012-140, 103
> T.C.M. (CCH) 1762, 1763.
>
> Substantial compliance may be shown where the taxpayer
> "provided most of the information required" or made omissions
> "solely through inadvertence." Hewitt v. Commissioner, 109 T.C.
> 258, 265 n.10 (1997), aff'd without published opinion, 166 F.3d 332
> (4th Cir. 1998). But in order to substantially comply, the taxpayer

[*18] must satisfy all reporting requirements that "relate 'to the substance or essence of the statute.'" Bond, 100 T.C. at 41 (quoting Taylor v. Commissioner, 67 T.C. 1071, 1077 (1977)); see Estate of Evenchik v. Commissioner, T.C. Memo. 2013-34, 105 T.C.M. (CCH) 1231, 1234 (declining to excuse reporting errors that go to the "essential requirements of the governing statute" (quoting Estate of Clause v. Commissioner, 122 T.C. 115, 122 (2004))). * * *

Here there are simply too many omissions to overlook or to categorize as inadvertent. Brannan Sands has not established substantial compliance. Its compliance can best be described as slipshod.

Respondent also argues that a charitable contribution deduction cannot be allowed because the transfer of the water storage easement to the District was not a gift but was part of a quid pro quo transaction to resolve a dispute with Bromley. Petitioner responds with an argument that the deduction should be allowed as part of a bargain sale (which, of course, was not shown in the space for such information on the Form 8283). Because there is no reliable evidence of the actual fair market value of the water storage easement transferred to the District, this latter argument must be rejected because of Brannan Sand's failure to provide proof. In any event we have considered these and other arguments of the parties and need not address them. We hold that the claimed charitable contribution deduction is disallowed for lack of substantiation as required by section 170 and section 1.170A-13, Income Tax Regs.

[*19] To account for the stipulation of settled issues,

Decision will be entered under

Rule 155.
