[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-12169
_____

Tax Court No. CIR-1: 13789-08

PECO FOODS, INC. & SUBSIDIARIES,

　　　　　　　　　　　　　　　　Petitioner-Appellant,

versus

COMMISSIONER OF IRS,

　　　　　　　　　　　　　　　　Respondent-Appellee.

_____

Petition for Review of a Decision of the
U.S. Tax Court
_____

(July 2, 2013)

Before MARTIN, HILL and BARKSDALE,* Circuit Judges.

HILL, Circuit Judge:

_____

* Honorable Rhesa H. Barksdale, United States Circuit Judge for the Fifth Circuit, sitting by designation.

This is a straightforward appeal from a decision of the Tax Court regarding different methods of depreciation.  Appellant-petitioner, Peco Foods, Inc. (Peco), petitioned the Tax Court for a redetermination of respondent-appellee, the Commissioner of Internal Revenue's (Commissioner), determination of Peco's federal income tax deficiencies of $120,751, $678,978, and $727,323, for its 1997, 1998, and 2001, taxable years.  After trial, the Tax Court held that, for depreciation purposes, Peco could not unilaterally change its original purchase price allocations made in two asset purchase agreements entered into when Peco acquired certain assets at two poultry processing plants.  We agree with the judgment of the Tax Court, and affirm.

## I.

Most of the facts are stipulated by the parties and are set forth in the Tax Court's opinion.  Peco is engaged in the business of poultry processing.  Seeking to expand its business, Peco, through two of its subsidiaries, Peco Foods of Mississippi, Inc. (PFMI), and Peco Farms of Mississippi, LLC (PFML), acquired two poultry processing plants in Mississippi.

In 1995, Peco entered an asset purchase agreement with Green Acre Farm, Inc. (Green Acre), to acquire certain assets of its Sebastopol poultry processing plant, for $27,150,000.  Included in the agreement was a schedule that allocated the purchase price of the acquired assets between PFMI and PFML, as the purchasing subsidiaries.  Of special note, Peco and Green Acre agreed to allocate the $27,150,000 purchase price among twenty-six assets "for all purposes (including financial accounting and tax purposes)" in accordance with the original Sebastopol allocation schedule.[1]

In 1998, Peco entered an asset purchase agreement with Marshall Durbin Food Corp. and Marshall Durbin Farms, Inc. (collectively, MD), to acquire certain assets of its Canton plant for $10,500,000.  Included in the agreement was a schedule that allocated the purchase price of the acquired assets between PFMI and PFML, as the purchasing subsidiaries.  Again, Peco and MD agreed to allocate the $10,500,000 purchase price among three assets "for all purposes (including financial accounting and tax purposes)" in accordance with the original Canton

---

[1] "Real Property" was defined in the Sebastopol agreement as "real property, leaseholds and subleaseholds therein, improvements, fixtures, and fittings thereon, and easements, rights-of-way, and other appurtenants thereto (such as appurtenant rights in and to public streets located within the state of Mississippi)".  "Equipment" was defined as "tangible personal property (such as machinery, equipment, computer hardware and software, furniture, automobiles, trucks, tractors, trailers, tools, jigs, and dies) located within the state of Mississippi."  For tax purposes, real property is Section 1250 property.  I.R.C. § 1250.  Tangible personal property is Section 1245 property.  I.R.C. § 1245.

allocation schedule.[2]  The Canton agreement also contained a merger clause stating that the contract, accompanying exhibits, and closing documents "constitute the entire agreement between [Peco and MD]."

## II.

In 1997, on its corporate income tax return, Peco used the straight-line method of depreciation, depreciating the non-residential real property (Section 1250 property) acquired in the Sebastopol acquisition over a period of thirty-nine years.[3]  As to the Canton acquisition, from 1998 through 2001 taxable years, Peco used accelerated methods of depreciation, which involved either a seven-year or a fifteen-year recovery period, and a double-declining or 150-percent methodology.

Then, in 1999, Peco commissioned an appraisal company, Moore Stephens Frost, PLC (MSF), to conduct a segregated cost analysis of the Sebastopol and Canton plants.  MSF presented its cost segregation study, which contained revised allocation schedules, subdividing the acquired assets into various subcomponents

---

[2] "Real Property" was defined in the Canton agreement as "real property, leaseholds and subleaseholds therein, improvements, fixtures, and fittings thereon, and easements, right-of-way [sic], and other appurtenant rights thereto (such as appurtenant rights in and to public streets) associated with a processing plant located in Canton, Mississippi."  "Equipment" was defined as "tangible personal property (such as machinery, equipment, furniture, automobiles, trucks tractors, trailers, tools and jigs) used in . . . [the Canton plant]."

[3] Depreciable non-residential real property included a property described as the "Processing Plant Building."  The original Sebastopol allocation schedule allocated $3,802,550 to this building.

4

which, according to MSF, entitled Peco to take an additional depreciation expense of $5,258,754, from 1998 through 2002.

Once Peco received the green light from MSF to unilaterally reform its own asset purchase agreements and their original allocation schedules, Peco filed its corporate income tax return for 1998, attaching Form 3115, Application for Change in Accounting Method.[4]   Beginning on its 1998 return, Peco abandoned its original straight-line, thirty-nine year method of depreciation, and adopted an accelerated method of depreciation for its Sebastopol assets; it used either a seven-year or fifteen-year class life, with a double-declining or 150-percent depreciation method.

The tax benefits derived, using shorter and faster depreciation methods, were obvious and immediate. The Commissioner took notice and issued notices of deficiency to Peco, disallowing the retroactive adjustments in the allocation schedules.  Peco petitioned the Tax Court in response to the notices of deficiency. The Tax Court held that Peco agreed to, was bound by, and could not modify, the

---

[4] In proposing to change its method of accounting from the straight-line method to the accelerated method, Peco relied upon Rev. Proc. 98-60, 1998-2 C.B. 759, 772.  Multiple properties were reclassified from nonresidential real property (Section 1250 property), to tangible personal property (Section 1245 property).  Apparently, Peco also relied on the then recently issued 1997 Tax Court case of *Hosp. Corp. of Am. v. Comm'r*, 109 T.C. 21 (1997), to bolster and justify its retroactive modification of allocation schedules.  As the Tax Court noted, Peco's reliance was misplaced.

5

original purchase price allocations set forth in the asset agreements, in order to obtain more favorable tax benefits.

This appeal followed.

## III.

We review the Tax Court's conclusions of law in its application of the tax code *de novo*, and its findings of fact for clear error. *See Campbell v. Comm'r*, 658 F.3d 1255, 1258 (11th Cir. 2011); *Estate of Jelke v. Comm'r*, 507 F.3d 1317, 1321 (11th Cir. 2007).

## IV.

As the Tax Court observed, this is a simple case. The most basic tax principles prescribe special allocation rules for determining a buyer's basis and a seller's gain or loss in an asset acquisition. I.R.C. § 1060.

Under I.R.C. § 1060(c), an applicable asset acquisition is any transfer of assets that constitutes a trade or business, and with respect to which the buyer's basis in these assets is determined wholly by the consideration paid for them. *Id*. Section 1060(a) was amended in 1990, to provide that where parties to an asset acquisition agree in writing, as to the allocation of any amount of consideration, or, as to the fair market value of any of the assets transferred, that agreement is

6

binding on the seller and buyer, unless the Commissioner determines that the allocation or fair market value is not appropriate.[5] *Id*.

The Tax Court found that the two original written agreements, allocating the purchase price of the Sebastopol plant, and the Canton plant, among the acquired assets, shall be binding upon Peco unless: (1) the Commissioner determines that they are not appropriate under I.R.C. § 1060(a); or (2) the agreements are unenforceable under traditional contract formation defenses. *See Danielson*, 378 F.2d at 775. As the Commissioner did not dispute the propriety of the original allocation schedules, the Tax Court only analyzed the enforceability of each agreement upon Peco.

As noted, both agreements contain the statement that the original allocation shall be used "for all purposes (including financial accounting and tax purposes)." Peco argues that the Sebastopol agreement is unenforceable because the term "Processing Plant Building" is ambiguous. *See* note 3 *supra*. Peco claims the term was meant to convey the parties' intention to include within the term "Processing

---

[5] The House report for amended I.R.C. § 1060(a), H. Rept. 101-881, at 351 (1990), states that an acquisition's written asset allocation will be binding on both parties for tax purposes unless the taxpayer can "[adduce] proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." *Comm'r v. Danielson*, 378 F.2d 771, 775 (3d Cir. 1967). This *Danielson* rule has been expressly adopted in this circuit. *See Bradley v. United States*, 730 F.2d 718, 720 (11th Cir. 1984); *Plante v. Comm'r*, 168 F.3d 1279, 1280-81 (11th Cir. 1999).

Plant Building" all of its special mechanical systems and assets constituting tangible personal property (Section 1245 property).

The Tax Court found Peco's ambiguity argument to be meritless. It determined that, by including the word "Building" in "Processing Plant Building" versus using the term "Processing Plant," this building/structure was clearly nonresidential real property (Section 1250 property). Mechanical systems and other Section 1245 property are not part of a building, but could be construed to be part of a "Processing Plant."

The Tax Court found that Peco intended "Processing Plant Building" to be treated as a single asset when it entered the Sebastopol agreement. We agree. Peco alleges no other defect in the Sebastopol agreement. Therefore, the contract is enforceable as unambiguous, and Peco is bound by the original allocation schedule. Peco must report its income under the straight line method of depreciation used before the request was made for a change in accounting method. I.R.C. § 1060; *Danielson*, 378 F.2d at 775.

Peco uses the same argument with the Canton asset acquisition agreement. It argues that the agreement is not enforceable because the term "Real Property: Improvements" is ambiguous. Peco claims it was the parties' intent that the term would encompass specialized mechanical systems and other Section 1245

8

property.  For the same reasons as in the Sebastopol agreement, the term is not ambiguous because the parties allocated the purchase price among three assets: "Real Property: Land," "Real Property: Improvements," and "Machinery, Equipment, Furnitures [sic] and Fixtures."

The Tax Court found that the decision to allocate the purchase price separately among the three assets clearly evidences Peco's intent not to allocate any part of the purchase price to subcomponent assets.[6]  We agree.  The term "Real Property: Improvements" is not ambiguous, and therefore, the original Canton allocation schedule is binding upon Peco.  I.R.C. § 1060; *Danielson*, 378 F.2d at 775.

In binding Peco to both agreements, the Commissioner can be assured that both the buyer (Peco), and the respective sellers, (Green Acre and MD), treat the assets consistently for federal tax purposes.  As the *Danielson* court observed, "'where parties enter into an agreement with a clear understanding of its substance and content, they cannot be heard to say later that they overlooked possible tax consequences.'" *Danielson*, 378 F.2d at 778, citing *Hamlin's Trust v. Comm'r*, 209 F.2d 761, 765 (10th Cir. 1954).

---

[6] The Canton agreement also contained a merger clause stating that the contract, accompanying exhibits, and closing documents "constitute the entire agreement between the Parties."

9

V.

The judgment of the Tax Court is affirmed.

AFFIRMED.