T.C. Memo. 2021-26

UNITED STATES TAX COURT

DUANE PANKRATZ, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 21255-13, 27239-13.　　　　　Filed March 3, 2021.

<u>Kacie N.C. Dillon</u>, <u>Benjamin J. Peeler</u>, and <u>Tim A. Tarter</u>, for petitioners.

<u>Christina L. Cook</u>, and <u>Lisa R. Jones</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  Dr. Duane Pankratz reported very large charitable

contributions on his returns for 2008 and 2009.  The form that he used stated in

plain language on its face that an appraisal is generally required to be attached for

donated property worth more than $500,000.  Pankratz didn't attach appraisals to

his returns.  The main question presented:  Can the failure to attach appraisals be

**[*2]** due to reasonable cause when a taxpayer admits that he did not review his tax returns before filing?

FINDINGS OF FACT

I. <u>Early Success</u>

Pankratz was raised on a farm in Freeman, South Dakota. His was not a pampered childhood--the farm had no running water and his chores were many and hard. But it made for a strong work ethic which has stayed with him throughout his professional life.

After high school Pankratz enrolled in a preveterinary program at South Dakota State University. He graduated and entered veterinary school at Iowa State where he left with a doctorate in veterinary medicine. He found a job in Iowa at a large-animal practice. He enjoyed the practice immensely, but had developed a love of teaching and went back to Iowa State in its pathology department.

It was here where Pankratz's fortune would turn. He had complained to his colleagues in the pathology department that there was no vaccine for an animal virus that he was studying. They helpfully suggested that maybe he could invent one if he thought he could. Turned out to be good advice. It took a great deal of time and effort, but Pankratz made it work. This got him noticed, and the United States Department of Agriculture asked him to come to work for the government.

[*3] He accepted, but also in his spare time he organized Grand Laboratories, Inc., to produce the vaccine, which he then began selling around Iowa.  It was a success--news of the vaccine went viral and, after only a year, he left the USDA to devote himself to Grand Labs.

Pankratz shifted production into high gear.  He bought a number of laboratories that had gone out of business to ramp up production.  Initial success gave him the time and resources to develop additional products.  Then these products took off.  Success bred success, and in 2002 Pankratz sold Grand Labs to Novartis for $85 million.

II.     Life Post-Grand Labs Businesses

This kind of success is not rare in America, but Pankratz's story afterward was unusual.  He didn't retire to a life of sun and sand; instead, he went home.

Even before he sold Grand Labs, Pankratz had owned a corporation called Borglum Historical Center, Inc., in Keystone, South Dakota, which ran a museum about the man who carved Mount Rushmore.  After he sold Grand Labs, owners of really small businesses who were nearing retirement began to offer them for sale. Pankratz started with a gas station, three restaurants, a campground, and then some motels near Mount Rushmore.  Then he bought ranch land across South Dakota and then some other real estate in Florida and Mississippi.  He kept these

**[*4]** businesses open and their employees working, and he thereby helped the very small economies in very sparsely populated communities.

By the time he got to the years before us, he'd invested in over a dozen ventures in South Dakota, more or less divisible into tourist businesses and ranches. Most of Pankratz's tourist investments were held under an umbrella entity called Project, LLC. Project, LLC, owned five hotels, two gas stations, and a management company. Out from under Project, LLC, were a couple other small businesses--Ghost Town Gas, which was a combined gas station, food store, and rock shop; and Dirt & Rocks, LLC. Dirt & Rocks itself owned two weirdly different businesses--Keystone Beverage, the holder of a liquor license; and Sandman Mining, which produced frac sand for local oil and gas operations. Pankratz had enough businesses to keep at least two bookkeepers fully employed. We can summarize them more easily in a table:

| [*5]     Entity | Property description | Bookkeeper |
|---|---|---|
| Rushmore View, LLC | Rushmore View Inn Motel and Grizzly Restaurant | Casey Peterson |
| Second Lady, LLC | Super 8 Motel | Casey Peterson |
| Sleep Land, LLC | Travelodge Motel (formally known as Miner's Motel & Sleepland) | Casey Peterson |
| Rushmore Express, LLC | Rushmore Express Motel (formally known as Kelly Inn) | Casey Peterson |
| Keystone Boardwalk, LLC | Boardwalk Inn & Suites Motel | Casey Peterson |
| Keystone Convenience, LLC | Convenience store with fuel service center, RV campground, laundromat, offices, and theater | Elaine Nash |
| LaGrand Station, LLC | LaGrand gas station/convenience store, tourist information stop and Call of the Wild[1] in Rapid City, South Dakota | Elaine Nash |
| Hills Hospitality, LLC | Management company | Casey Peterson |
| Project, LLC | Umbrella organization containing above LLCs | Casey Peterson |
| Ghost Town Gas | Gas station, food shop, small rock shop | Casey Peterson |
| Dirt & Rocks, LLC | Keystone Beverage (Peggy's place), a liquor license, and the Sandman Mining operations | Casey Peterson |

---

[1] Call of the Wild housed Pankratz's taxidermy collection in a 2,500 square-foot space in LaGrand Station. Some of these animals were ones that he hunted over the years while others were ones he bought. Pankratz wanted to make it one of those unexpected roadside attractions that set small children to bothering their parents to please, please stop.

**[*6]**    The bookkeeping for these businesses was originally done by a lady identified in testimony only as "Sue". After some audits didn't go as well as he'd hoped, however, Pankratz hired Casey Peterson & Associates to do the bookkeeping for some, but not all, of these businesses. That firm chose Kasey Gerlach, a licensed CPA, to work on the account. So it was that in 2008 she began to do the bookkeeping for the several businesses we've listed.

For each of them, she recorded income and expenses in QuickBooks from invoices she received. She sorted the invoices by entity and got her manager's approval to pay them if needed. Gerlach would then enter expenses into QuickBooks and print the checks. She also did the payroll for some of these businesses.

Pankratz had a different bookkeeper for LaGrand Station and Keystone Convenience. That was Elaine Nash, who was the onsite manager's ex-wife. He had recommended her for the job, and Pankratz believes she is a great bookkeeper.

But those were only the tourist businesses. There were also ranches. Pankratz owned over 13,000 acres in seven counties in South Dakota. The bookkeeping for these was done by Jim Horning, one of Pankratz's longest serving employees. Horning had graduated from Briar Cliff College with a bachelor of arts degree in accounting, and done a brief stint at an accounting firm.

**[\*7]** He is not a CPA, attorney, or licensed tax preparer, but over the years his role grew to include paying and filing invoices, depositing checks, reconciling bank statements, and compiling and collecting other financial information. He also prepares information for Pankratz's income-tax return every year.

III. Significant Tax Events

Apart from the day-to-day bookkeeping of these numerous businesses, there were other significant tax events that occurred during the years at issue.

A. Cost-Segregation Study

In 2008, Pankratz was approached by Gerlach and her boss to talk about cost segregation. A cost-segregation study breaks out the costs of certain assets to justify their depreciation faster than the rate they would be eligible for as a part of real property. Alvin Arnold, Real Estate Professional's Tax Guide, sec. 4:29 (2020); see also Peco Foods, Inc. & Subs. v. Commissioner, T.C. Memo. 2012-18, 103 T.C.M. (CCH) 1120, 1122 (2012), aff'd, 522 F. App'x 840 (11th Cir. 2013). They believed that the positions Pankratz took on his older returns were too conservative and "left a lot of money on the table." A cost-segregation study, they explained, would allow him to depreciate some of his business assets faster and thus lower his tax bill. After a few pointed questions to make sure such a

[*8] study was legitimate and would pass muster if the IRS audited, Pankratz agreed to have a cost-segregation study prepared for several of his businesses.

Pankratz tapped BDO USA, LLP, because Gerlach and her boss gave the firm a glowing recommendation.[2]  Raymond Kuiper, a cost-segregation specialist and manager with BDO, completed seven cost-segregation studies for seven different Pankratz businesses:

- Rushmore Express, LLC;

- Rushmore View, LLC;

- Keystone Boardwalk, LLC;

- Second Lady, LLC;

- Sleep Land, LLC;

- Keystone Convenience, LLC; and

- Keystone Beverage, LLC.

Kuiper does his work with care.  He starts by visiting the property to take notes and pictures, and then he interviews the owner.  Once he gets all the information, he places it into a spreadsheet that lists specific building components

---

[2] Casey Peterson was a BDO Alliance firm.  A number of years ago, BDO aligned itself with some middle-market accounting firms around the country, including Casey Peterson.  The alliance allowed smaller firms to offer services such as cost-segregation studies that the average middle-market firm couldn't provide.

[*9] called units of property. These units are building components such as footings, foundations, and structural steel, as well as any masonry, carpentry, electrical, HVAC, and plumbing. When Kuiper did the studies for Pankratz's businesses, he had complete access to any records he wanted and Pankratz gave him all the information that he asked for.

BDO puts its initial drafts through peer review. Kuiper would then send the study to his senior director who completed a final review, and finally to a CPA for a section 481 adjustment review.[3] Kuiper and BDO took all these steps for Pankratz's cost-segregation studies. Casey Peterson received the draft cost-segregation studies to review in 2008.

There was only one glitch--these were *draft* studies. BDO didn't put them into final form until 2010, yet Casey Peterson used the draft studies to prepare Pankratz's 2008 tax return. In 2010, after all the internal review was finally done, BDO provided Pankratz with a written tax opinion on which he could undoubtedly

---

[3] Section 481 details when and how a taxpayer can change his accounting method. "The purpose of § 481 is to prevent either a distortion of taxable income or a windfall to the taxpayer arising from a change in accounting method when the statute of limitations bars reopening of the taxpayer's earlier returns." Pinkston v. Commissioner, T.C. Memo. 2020-44, 2020 WL 1847110, at *3 (quoting Suzy's Zoo v. Commissioner, 273 F.3d 875, 883 (9th Cir. 2001), aff'g 114 T.C. 1 (2000)). All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless we say otherwise.

**[\*10]** rely. And we do specifically find that there were only insubstantial changes between the 2008 draft and the final 2010 tax opinion.

B.     Noncash Contributions

During the years in issue, Pankratz made several noncash charitable contributions. We must focus on three large contributions--two in 2008 and one in 2009.[4]

1.     Interest in Oil and Gas Fields

In 2008, Pankratz donated his interests in four oil and gas projects to Missionary Church, Inc. Pankratz liked the Church's training programs in South Dakota, and saw his donation as a way of giving Missionary Church "something of real substance." Pankratz valued the donation at $2 million based on his purchase price as well as what he said he expected its appreciation to be. He did not obtain a professional appraisal of these interests before he filed his return.

2.     Rapid City Land

Another large noncash donation that he made in 2008 was of 5.78 acres of land to Rapid City, South Dakota for road and utility improvements. Pankratz

---

[4] Pankratz had also made a large noncash donation sometime before 2000, but the IRS had accepted his return as filed.

**[\*11]** conceded that this deduction should be disallowed. He never obtained a professional appraisal of this property.

### 3. Conference Center

In 2009 Pankratz donated a conference center--both the building and surrounding land--to Keystone Project, Inc., another religious charity. To determine its value, Pankratz contracted with Ron Rossknecht, a certified general appraiser in South Dakota, and asked for his help. After viewing the property, however, Rossknecht felt uncomfortable providing an appraised value. He believed the property was a very elaborate complex, and he had never seen a similar building in his appraisal career. He felt he couldn't complete the appraisal according to Uniform Standards of Professional Appraisal Practice (USPAP).[5]

Rossknecht did describe to Pankratz the three traditional valuation methods --comparable sales, income, and replacement cost--that appraisers use, and then explained why he felt uncomfortable using any of them. He told Pankratz that of the three methods, the replacement cost approach had "the most solid evidence."

---

[5] USPAP are promulgated by the Appraisal Standards Board of the Appraisal Foundation. <u>Whitehouse Hotel Ltd. P'ship v. Commissioner</u>, 131 T.C. 112, 126 (2008), <u>vacated and remanded</u>, 615 F.3d 321 (5th Cir. 2010). "USPAP is widely-recognized and accepted as containing standards applicable to the appraisal profession. Adherence to those standards is evidence that the appraiser is applying methods that are generally accepted within the appraisal profession." <u>Id.</u> at 127.

**[*12]** However, due to the lack of any comparable properties (which were needed for this approach), Rossknecht didn't want to appraise the donated property.

Pankratz did not try to get another appraisal, but instead totaled up the cost of the conference center and claimed that amount as a deduction.

IV.   Tax Preparation

A.    The Process

Pankratz retained Wohlenberg Ritzman & Co.--the same accounting firm that has prepared his tax returns since the early 1970s--to do his 2008 and 2009 returns.  Pankratz's goal for Wohlenberg was to compile a "good, honest income tax return."  Blaine Meier, a CPA and partner at Wohlenberg, had taken over as the primary preparer of Pankratz's tax returns starting in 2005, and was in charge of his 2008 and 2009 returns.

Meier had a standard procedure.  A client would come into the office for a face-to-face meeting and discuss the tax information he brought with him.  After going through the information, Meier (or a Wohlenberg staff member) would enter the information into tax-preparation software.  Meier would then do a final review to make sure all of the information had been properly entered, the correct forms used, and the calculations checked--and give the return his final approval.  He would then process and file the tax return.

[*13] His process for Pankratz, however, was different. Neither he nor the staff at Wohlenberg prepared the return directly. Instead, Horning gathered information and took it to Wohlenberg where Horning personally entered information into the firm's tax-preparation software. Meier testified, and we do find him credible on this point, that he himself would then review what Horning had prepared. We also find that Meier went form by form, and reviewed all the forms that were part of the return. Wohlenberg's software was also written to notify Meier of any issues so that he could raise with the client any issue that it flagged. Things were, again, a bit different with Pankratz. Meier didn't discuss any flagged issues with him, but with Horning. Horning was then supposed to discuss them with Pankratz. Meier said, and again we find him credible on this, that he never spoke to Pankratz directly because "he wasn't around." After this indirect review, Meier would sign the return.

This roundabout way of return preparation had caused errors in the past. And we do find Pankratz was aware of these issues before he filed his 2008 and 2009 returns.

B.    2008

For the 2008 return, Horning went to Wohlenberg and personally typed the information into the tax software. This included information demanded by Form

**[*14]** 8283, Noncash Charitable Contributions.[6]  Form 8283 is a two-page form,

and its second page is very important to these cases.  We reproduce that page here:

_____

[6] We note that Form 8283 was most recently updated in 2020.  See IRS Form 8283 (rev. Dec. 2020).  We are describing the form in use for the years in issue.

**[*15]**

Form 8283 (Rev. 12-2005) | Page **2**

| Name(s) shown on your income tax return | Identifying number |
|---|---|

### Section B. Donated Property Over $5,000 (Except Certain Publicly Traded Securities)—List in this section only items (or groups of similar items) for which you claimed a deduction of more than $5,000 per item or group (except contributions of certain publicly traded securities reported in Section A). An appraisal is generally required for property listed in Section B (see instructions).

**Part I** — **Information on Donated Property**—To be completed by the taxpayer and/or the appraiser.

**4**    Check the box that describes the type of property donated:

☐ Art* (contribution of $20,000 or more)    ☐ Qualified Conservation Contribution    ☐ Equipment

☐ Art* (contribution of less than $20,000)    ☐ Other Real Estate    ☐ Securities

☐ Collectibles**    ☐ Intellectual Property    ☐ Other

*Art includes paintings, sculptures, watercolors, prints, drawings, ceramics, antiques, decorative arts, textiles, carpets, silver, rare manuscripts, historical memorabilia, and other similar objects.

**Collectibles include coins, stamps, books, gems, jewelry, sports memorabilia, dolls, etc., but not art as defined above.

**Note.** If your total art contribution was $20,000 or more, you must attach a complete copy of the signed appraisal. If your deduction for any donated property was more than $500,000, you must attach a qualified appraisal of the property. See instructions.

| 5 | **(a)** Description of donated property (if you need more space, attach a separate statement) | **(b)** If tangible property was donated, give a brief summary of the overall physical condition of the property at the time of the gift | **(c)** Appraised fair market value |
|---|---|---|---|
| A | | | |
| B | | | |
| C | | | |
| D | | | |

| | **(d)** Date acquired by donor (mo., yr.) | **(e)** How acquired by donor | **(f)** Donor's cost or adjusted basis | **(g)** For bargain sales, enter amount received | **(h)** Amount claimed as a deduction | **(i)** Average trading price of securities |
|---|---|---|---|---|---|---|
| A | | | | | | |
| B | | | | | | |
| C | | | | | | |
| D | | | | | | |

(See instructions — over columns (h) and (i))

**Part II** — **Taxpayer (Donor) Statement**—List each item included in Part I above that the appraisal identifies as having a value of $500 or less. See instructions.

I declare that the following item(s) included in Part I above has to the best of my knowledge and belief an appraised value of not more than $500 (per item). Enter identifying letter from Part I and describe the specific item. See instructions. ▶ _____

Signature of taxpayer (donor) ▶      Date ▶

**Part III**    **Declaration of Appraiser**

I declare that I am not the donor, the donee, a party to the transaction in which the donor acquired the property, employed by, or related to any of the foregoing persons, or married to any person who is related to any of the foregoing persons. And, if regularly used by the donor, donee, or party to the transaction, I performed the majority of my appraisals during my tax year for other persons.

Also, I declare that I hold myself out to the public as an appraiser or perform appraisals on a regular basis; and that because of my qualifications as described in the appraisal, I am qualified to make appraisals of the type of property being valued. I certify that the appraisal fees were not based on a percentage of the appraised property value. Furthermore, I understand that a false or fraudulent overstatement of the property value as described in the qualified appraisal or this Form 8283 may subject me to the penalty under section 6701(a) (aiding and abetting the understatement of tax liability). I affirm that I have not been barred from presenting evidence or testimony by the Office of Professional Responsibility.

**Sign Here**    Signature ▶      Title ▶      Date ▶

| Business address (including room or suite no.) | Identifying number |
|---|---|
| City or town, state, and ZIP code | |

**Part IV**    **Donee Acknowledgment**—To be completed by the charitable organization.

This charitable organization acknowledges that it is a qualified organization under section 170(c) and that it received the donated property as described in Section B, Part I, above on the following date ▶ _____

Furthermore, this organization affirms that in the event it sells, exchanges, or otherwise disposes of the property described in Section B, Part I (or any portion thereof) within 2 years after the date of receipt, it will file **Form 8282,** Donee Information Return, with the IRS and give the donor a copy of that form. This acknowledgment does not represent agreement with the claimed fair market value.

Does the organization intend to use the property for an unrelated use? . . . . . . . . . . . . . . . . . ▶ ☐ Yes    ☐ No

| Name of charitable organization (donee) | Employer identification number |
|---|---|
| Address (number, street, and room or suite no.) | City or town, state, and ZIP code |
| Authorized signature | Title | Date |

**[*16]** Section B of the form has to be completed when a taxpayer donates property worth more than $5,000. The top of section B tells taxpayers that appraisals are generally required for properties that they list. Part I notes again that for deductions of more than $500,000 "you must attach a qualified appraisal of the property." Question 5(c) asks for the "[a]ppraised fair market value." Part III is a declaration of an appraiser--and requires the signature of the appraiser used for the listed properties in Part I.

We think that four mentions of "appraisal", "appraiser", or "appraised" on one page of one form is pretty good notice that substantial noncash donations need to be backed up by an appraisal. Yet despite all these warning signals, Pankratz never had a professional appraisal performed or attached one to either his 2008 or 2009 return for any of the large noncash charitable donations that he claimed. Horning instead listed the donations as "4 OIL/GAS FIELDS" with a value of $2 million and "5.78 AC PAVED ROAD" with a value of $1,513,146.

Meier reviewed this return. Meier noticed the large noncash contributions listed on Form 8283 and noticed that no appraisals were attached. Meier raised

[*17] this issue with Horning.[7]  But we also find credible the testimony that neither Meier nor Horning told Pankratz himself about this problem.

Despite this potential issue, Meier signed the return, and Horning filed it. Throughout this process Meier never met with Pankratz to discuss his return.  And Pankratz never reviewed his 2008 return before it was filed, because it was filed a day or two before the deadline and he wasn't around.

C.    2009

For the 2009 return the process was mostly the same.  Horning compiled the information, went to Wohlenberg, and fed it into the firm's tax software.  He recorded the donation of the conference center on Form 8283.  He listed the donation as "CONFERENCE CENTER" in section B, part I of Form 8283.  He left the appraised fair market value blank.  He attached no appraisal to the return.

Meier again reviewed the return and again noticed that there was no appraisal attached to Form 8283.  He again told Horning that this was a problem. This time, however, Horning called Pankratz and told him that he needed an appraisal if he wanted a deduction for his donation of the conference center.

_____

[7] We make this finding because Meier stated he reviewed the Form 8283 and, although he couldn't state definitively whether he raised this issue with Horning, he said it would have been part of his normal procedure to raise this type of issue.  We also believe it is more likely than not that a tax firm's tax-preparation software would have also flagged this error and notified Meier.

[*18] Pankratz asked Horning if instead he could just deduct the cost of the building. Pankratz and Horning discussed it and finally decided this informal valuation would work. They valued the conference center at its cost. We specifically find that they didn't ask Meier whether this informal valuation was appropriate. As with the 2008 return, Pankratz never had a face-to-face meeting with Meier. He never spoke on the phone with Meier. And most importantly, he never reviewed the final return before it was filed shortly before it was due.

V.     Audit, Settlements, and Trial

The Commissioner decided to audit both Pankratz's 2008 and 2009 tax years. He determined deficiencies and penalties of more than $10 million. There were a great many issues in both notices. The parties settled their disagreements about the items on Pankratz's Schedules C, Schedules E, Schedules F, and some of the itemized deductions on his Schedules A. Pankratz conceded that depreciation deductions that he thought he was entitled to because he'd paid BDO for cost-segregation studies should also be disallowed. He also conceded that several itemized deductions should be disallowed.[8]

---

[8] These deductions included one for the donation of 5.78 acres of land to Rapid City, South Dakota, which was disallowed because he failed to attach an appraisal.

**[\*19]** The penalties related to these adjustments and concessions remain at issue.

The Commissioner cleared his procedural hurdles in determining penalties by

introducing both years' civil-penalty approval forms properly filled out for both

negligence and substantial-understatement penalties.  We tried the cases in St.

Paul.[9]  We are left to decide whether Pankratz is

- entitled to a charitable deduction for the donation of his oil and gas
  interests in 2008,

- entitled to a charitable deduction for the donation of the conference
  center in 2009, and

- liable for any penalties.

OPINION

I.    Charitable Contributions

A.    General Rules

Section 170(a)(1) states that "[a] charitable contribution shall be allowable

as a deduction only if verified under regulations prescribed by the Secretary."  The

Deficit Reduction Act of 1984 (DEFRA), Pub. L. No. 98-369, sec. 155(a)(1)(A),

98 Stat. at 691, ordered the Secretary to prescribe regulations under section

170(a)(1) that would require a taxpayer who claims a deduction for the donation of

_____

[9] Pankratz was a resident of South Dakota when he filed the petitions, which means that any appeal would presumptively go to the Eighth Circuit.  See sec. 7482(b)(1)(A).

[*20] property worth more than $5,000 to "obtain a qualified appraisal for the property contributed." DEFRA section 155 defined "qualified appraisal" to include any "additional information as the Secretary prescribes in such regulations." Id. at 692. Congress codified that concept in 2004 by adding paragraph (11) to section 170(f). American Jobs Creation Act of 2004, Pub. L. No. 108-357, sec. 883(a), 118 Stat. at 1631.

Section 170(f)(11)(A) provides that for any noncash contribution of more than $500, subparagraphs (B), (C), and (D) must be satisfied. Subparagraph (B) requires that the individual "include[] with the return for the taxable year in which the contribution is made a description of such property and such other information as the Secretary may require." Sec. 170(f)(11)(B). Subparagraph (C) requires that for contributions over $5,000, the taxpayer both obtain a qualified appraisal and attach a summary to his return. Sec. 170(f)(11)(C); see also sec. 1.170A-13(c)(1) and (2), Income Tax Regs. Subparagraph (D) requires that when a taxpayer claims a deduction of more than $500,000 he attach the qualified appraisal itself to his return. Sec. 170(f)(11)(D).

The purpose of these requirements is to provide the IRS with "sufficient information to evaluate the claimed deduction and 'deal more effectively with the prevalent use of overvaluations.'" Scheidelman v. Commissioner, 682 F.3d 189,

[*21] 198 (2d Cir. 2012) (quoting Hewitt v. Commissioner, 109 T.C. 258, 265 (1997), aff'd, 166 F.3d 332 (4th Cir. 1998)), vacating and remanding T.C. Memo. 2010-151. Taxpayers must report this information on Form 8283. See Jorgenson v. Commissioner, T.C. Memo. 2000-38, 79 T.C.M. (CCH) 1444, 1450 (2000).

Pankratz concedes that he did not attach a qualified appraisal of either his oil and gas interests or the conference center to his returns. The complete denial of a deduction can be harsh, but this failure alone might be enough for us to deny the contested deductions. See sec. 170(f)(11)(A)(i). There is but one hope for Pankratz--section 170(f)(11)(A)(ii)(II). Congress, when it codified many of the old substantiation regulations in section 170(f)(11), added an escape hatch from nondeductibility for well-intentioned taxpayers. Section 170(f)(11)(A)(ii)(II) tells us not to deny a deduction for failure to comply with subparagraph (B), (C), or (D) "if it is shown that the failure to meet such requirements is due to reasonable cause and not to willful neglect." Neither the Code nor the regulations tell us what "reasonable cause" means in this section, but "reasonable cause" is a phrase that one finds in a great many sections of the Code that provide for defenses to penalties and additions to tax. And we've already held that we should look to cases that apply those sections to give meaning to the term in this section. See Presley v. Commissioner, T.C. Memo. 2018-171, 116 T.C.M. (CCH) 387, 402

[*22] (2018), aff'd, 790 F. App'x 914 (10th Cir. 2019); Crimi v. Commissioner, T.C. Memo. 2013-51, 105 T.C.M. (CCH) 1330, 1353 (2013).

We address each deduction separately.

B.     2008

Pankratz first addresses whether he had reasonable cause for not attaching a qualified appraisal for the interest in oil and gas fields that he donated to Mission Church. He argues that he had hired an accounting firm, Wohlenberg, to prepare a good tax return with Horning's help.

Reasonable cause requires a taxpayer to exercise ordinary business care and prudence. See, e.g., United States v. Boyle, 469 U.S. 241, 246 (1985); Presley, 116 T.C.M. (CCH) at 402. Whether a taxpayer had reasonable cause is a fact-intensive inquiry that requires a case-by-case examination of all the facts and circumstances presented. Presley, 116 T.C.M. (CCH) at 402; Crimi, 105 T.C.M. (CCH) at 1353. Pankratz argues that he had reasonable cause for the position he took on his return because he reasonably relied on Meier's and Horning's advice. When a taxpayer claims to have relied on the advice of a professional, he must show that:

- the professional was a competent tax adviser with sufficient expertise to justify reliance,

**[*23]** ● he provided necessary and accurate information to the professional who gave him advice, and

● he actually relied in good faith on that advice.

See Alt. Healthcare Advocates v. Commissioner, 151 T.C. 225, 246 (2018); Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

### 1. Competent Tax Adviser

It is uncontested that Meier is a competent tax adviser with sufficient expertise to justify reliance. Whether Horning is a competent tax adviser with sufficient experience to justify reliance is a more difficult question.

There is no precise threshold of competence that a tax adviser must have to justify reliance. Our practical test looks for expertise commensurate with the facts of each case. CNT Inv'rs, LLC v. Commissioner, 144 T.C. 161, 224 (2015); see also Neonatology, 115 T.C. at 99 (insurance agent lacked sufficient expertise to advise on complex, group whole/term hybrid life insurance plan); Thousand Oaks Residential Care Home I, Inc. v. Commissioner, T.C. Memo. 2013-10, 105 T.C.M. (CCH) 1056, 1066 (2013) (longtime accountant who prepared tax returns full time, was an enrolled agent, and had a master's degree in business administration was competent professional to advise on employment-plan contributions).

**[*24]** When we apply this practical test, we find that Horning was not a competent tax adviser. He is not a CPA. He is not an attorney. He is not a full-time return preparer. He has no professional license of any kind. He is just a longtime employee who provides financial-related support to Pankratz and has a bachelor's degree in accounting. We are specifically not saying that a professional license is always required for a reliance defense to penalties, only that Horning's experience is not enough to make him competent to prepare a large and complex tax return which included information from over a dozen businesses and farms. Pankratz himself knew that his usual way of preparing returns for his businesses had led to understatements of tax in the past. And it leads us to find again, as we did in Kirman v. Commissioner, T.C. Memo. 2011-128, 101 T.C.M. (CCH) 1625, 1633 (2011), that a longtime preparer may not be a competent adviser on whom a taxpayer could reasonably rely.

### 2.     Provision of Information

We are left to determine whether Meier satisfies the last two Neonatology requirements. Did Pankratz provide Meier necessary and accurate information? The regulations clarify that the taxpayer can't "fail[] to disclose a fact that it knows, or reasonably should know, to be relevant to the proper tax treatment of an item." Sec. 1.6664-4(c)(1)(i), Income Tax Regs. We have already stated that a

[*25] taxpayer is not obliged to share details that a reasonably prudent taxpayer would not know, or that he would neither know nor reasonably should know are relevant. CNT Inv'rs, LLC, 144 T.C. at 228.

Here, we find that Pankratz did provide all necessary information to Meier, because the firm had all the working papers that Horning used to prepare the return. The irony is not lost on us that these cases focus around an appraisal that was not provided--which would seemingly indicate that Pankratz did not provide *all* necessary information. There's a subtle point here: We think it reasonable for Pankratz to not know *before* he prepared his return that he needed an appraisal. The last time he made a large, noncash contribution he hadn't attached an appraisal to his return and yet it had been accepted by the IRS. But we want to be careful about limiting this finding of reasonableness--we find only that it was reasonable for Pankratz to not know about this requirement when he first submitted information to the Meier firm.

### 3. Good Faith Reliance on Advice

The last requirement is that a taxpayer must have actually relied on advice in good faith. Neonatology, 115 T.C. at 99. Advice is "any communication, including the opinion of a professional tax adviser, setting forth the analysis or conclusion of a person, other than the taxpayer, provided to (or for the benefit of)

[*26] the taxpayer and on which the taxpayer relies, directly or indirectly." Sec. 1.6664-4(c)(2), Income Tax Regs. We look to see whether the taxpayer relied on the adviser's *judgment*. See Woodsum v. Commissioner 136 T.C. 585, 593 (2011). Horning, for example, did not advise; he simply prepared the return by inputting data into the Wohlenberg firm's tax software. See Parker v. Commissioner, T.C. Memo. 2012-357, 104 T.C.M. (CCH) 823, 828 (2012) (no advice because no evidence return preparer exercised judgment).

We first have to figure out whether Meier actually advised Pankratz that he didn't need an appraisal. The big problem for Pankratz here is that Meier told Horning that there needed to be an appraisal, yet neither Horning nor Pankratz nor anyone else ever got one. We do find Pankratz credible when he said that no one ever told *him* he needed an appraisal. And we acknowledge that Pankratz never had a face-to-face meeting with Meier or spoke with him over the phone. But this only makes it easier for us to find that Pankratz did not rely on Meier's advice.

Then there's the problem that Pankratz admitted that he never reviewed his return. A taxpayer's failure to review a return, though troubling, is not by itself fatal--there can be cases where even diligent taxpayers wouldn't be able to see a subtle problem in their tax returns. CNT Inv'rs, LLC, 144 T.C. at 234. That's not the case here.

[*27] We first look to Pankratz's education, sophistication, and business experience. He is very well educated, with both a college degree and a doctorate. And, although he tried to represent himself as a lowly farm hand, he is a sophisticated and savvy businessman--he was able to create Grand Labs from nothing and sell it for $85 million, and he then invested his money in several different ventures in several different states. He may lack formal tax training, but we find that he possesses a sharp and sophisticated mind for business. Had Pankratz simply looked at Form 8283 he would have noticed that, at the very least, he likely needed to get appraisals. This makes his case unlike CNT Investors, LLC, because there the taxpayer met with his adviser and his review of the return would not have shown any issues. See CNT Inv'rs, LLC, 114 T.C. at 234.

One does not have to be a tax expert to be able to read Form 8283. Had Pankratz reviewed that two-page form, he would have seen that it said "[a]n appraisal is generally required for property listed in Section B," or "you must attach a qualified appraisal of the property," or "[a]ppraised fair market value," or "Declaration of Appraiser." For a man as smart as Pankratz, this would have suggested that there was a potential major error on the return, and should have

**[\*28]** prompted him (at the very least) to ask Meier whether an appraisal was needed.[10]  Instead, he just signed the return.

With neither advice nor good faith reliance on that advice, we deny the deduction for Pankratz's contribution of his interests in the oil and gas fields.

C.    2009

In 2009, Pankratz donated the conference center to Keystone Project, Inc. He again concedes that he failed to attach an appraisal to his return.  And again he relies on the exception found in section 170(f)(11)(A)(ii)(II) to preclude the denial of his deduction under the general rules found in section 170(f)(11).  He again argues that he relied on Horning and Meier, but this time on Rossknecht as well.

Nothing changed for Horning between the 2008 and 2009 tax-preparation seasons.  He did not become a competent tax adviser.  And Pankratz certainly didn't rely on Meier's advice for this return position--Horning called Pankratz to tell him that Meier had said that there needed to be an appraisal.

That leaves only Rossknecht.  Remember that Rossknecht declined to appraise the property because it was unique and appraising it was too complex.

---

[10] Pankratz's excuse that he didn't review his return because he filed with only a day or so to spare and that he wasn't around when the return was filed offers no relief.  Errors caused by waiting till the last minute to file are not reasonable.  See sec. 1.6664-4(b)(2), Example (4), Income Tax Regs.

**[\*29]** Though he told Pankratz that the cost method had the "most solid evidence," Rossknecht was himself unable to complete that analysis. We are unpersuaded by Pankratz's testimony--which is indirectly contradicted by Rossknecht's credible testimony--that Rossknecht told Pankratz to simply add up the cost to value the property. And even if Pankratz was told to just add up the cost and take the deduction, there is no evidence that Rossknecht--who seems to be a competent and honest appraiser--was also a competent *tax* adviser. This means Pankratz can't rely on his opinion. See Neonatology, 115 T.C. at 99 (insurance agent lacked expertise to advise on tax rules for insurance plan).

The exception of section 170(f)(11)(A)(ii)(II) does not apply. We deny any deduction for the charitable contribution of the conference center.

II. Penalties

The parties settled many of the substantive issues before trial. They did not, however, settle the issue of whether Pankratz owes penalties for any underpayments of his tax liabilities attributable to either those settled issues or the noncash charitable contributions we've just discussed. That makes for a somewhat complicated analysis. We'll first discuss whether the Commissioner met the procedural requirements for determining penalties, and then look at

[*30] whether penalties apply to the disallowed deductions. We won't do this item by item, but will instead divide the disallowed deductions into four groups:

- the charitable deductions for donations of the oil and gas interests and conference center,

- the conceded disallowed deduction for donation of land to a local municipality,

- depreciation expenses based on the cost-segregation studies, and

- business expenses.

A.    Procedure

We first decide whether the Commissioner complied with section 6751(b)(1), which states that no penalty is allowed unless the "initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination." He must show that this written approval occurred no later than the date he issued the notice of deficiency or the date he files an answer or amended answer in which he asserts the penalty. See Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017), aff'g in part, rev'g in part 109 T.C.M. (CCH) 1206; see also Graev v. Commissioner, 149 T.C. 485, 493-95 (2017), supplementing and overruling in part 147 T.C. 460 (2016).

[*31] The Commissioner introduced Civil Penalty Approval Forms that showed that a manager approved the penalties in writing before the notices of deficiency were sent to Pankratz, as well as before a revenue agent's report or any other communication from the Commissioner that one might plausibly consider an "initial determination." Pankratz argues that there is no evidence that the individual who proposed the penalties prepared the forms or that the person who signed the forms is the immediate supervisor of the person who proposed the penalties. The parties, however, stipulated the introduction of the penalty-approval forms. Pankratz reserved his right to object to their admission on the grounds of relevance, materiality, and an objection under Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324 (1974). But he never made any of these objections, and he did not introduce any evidence to undermine their credibility. With these forms, the Commissioner satisfied the procedural requirements for imposing penalties.

    B.    <u>Substance</u>

Section 6662(a) imposes a 20% penalty on the portion of an underpayment of tax attributable to any substantial understatement of income tax. The Commissioner has the initial burden of production to show that the understatements of tax were substantial. <u>See</u> sec. 7491(c). This is a math

[*32] question: An understatement of income tax is substantial if it exceeds the greater of $5,000 or "10 percent of the tax required to be shown on the return." See sec. 6662(d)(1)(A). The math shows that Pankratz substantially understated his tax for both 2008 and 2009.

Pankratz has a defense if he can show that he had reasonable cause and acted in good faith in taking the erroneous return position.[11] See sec. 6664(c)(1). He argues that he had reasonable cause for claiming all four groups of deductions. He asks us to apply the familiar three-factor Neonatalogy test--retention of a competent adviser, full disclosure of relevant information, and actual reliance in good faith. See supra pp. 23-26.

1.    Oil and Gas Interest and Conference Center

The first group of deductions to look at is the noncash charitable contributions we've already denied for lack of an appraisal. Our discussion

---

[11] Pankratz halfheartedly argues that he relied on substantial authority, a distinct defense to a substantial-understatement penalty. See sec. 1.6662-4(d)(1), Income Tax Regs. Pankratz, however, identifies as substantial authority those Code sections that govern the deductibility of business expenses. While a taxpayer may find substantial authority in a "well-reasoned construction of the applicable statutory provision," see id. at (3)(ii), Pankratz failed to assert any construction that supported his position, let alone a well-reasoned one. Mere citation to the Code is not enough to prove this defense.

[*33] focused on the reasonableness defense that Pankratz raised against disallowance of those deductions.

Our conclusion--that Pankratz lacked reasonable cause for omission of appraisals--was based on regulations and precedents under section 170(f)(11)(A)(ii)(II), which we used because caselaw tells us that the defense is the same for both sections. So it is. And we find in this context, and for the same reasons stated above, that Pankratz lacked reasonable cause claiming those deductions. Penalties apply here.

### 2. Itemized Deductions

The next disallowed deduction that the Commissioner wants to penalize is the one Pankratz claimed for land he donated to Rapid City, South Dakota. Pankratz conceded the disallowance of any deduction for this donation. The notice of deficiency denied this deduction because the donated property was not properly described and its value was not properly substantiated with an appraisal. Pankratz again argues that he relied on the advice of Meier and Horning. We again find that though Horning prepared the return, he did not provide "advice" as defined by section 1.6664-4(c)(2), Income Tax Regs. See Parker, 104 T.C.M. (CCH) at 828 (no evidence return preparer exercised judgment). We have already found that Meier was a competent tax adviser with sufficient expertise to justify

**[*34]** reliance. We also find that Meier was given all information required--Horning gave him all of his working papers used to fill out the return. The key problem is whether Pankratz relied on Meier's advice in good faith.

Just as we found that Pankratz did not rely in good faith on Meier's advice in taking deductions for the contributions of his interest in oil and gas fields and the conference center, so we find he did not rely in good faith on Meier's advice in taking deductions for the contribution of land.

### 3. Cost-Segregation Study

Pankratz also took several depreciation deductions based on several cost-segregation studies performed by BDO. The parties agree that these deductions should be disallowed. Pankratz's reliance defense is much more solid here. It is undisputed that BDO is a reputable firm, and Casey Peterson reasonably recommended it to Pankratz. Kuiper himself was a cost-segregation specialist and a manager at BDO. This is more than enough expertise to justify reliance.

Pankratz also provided BDO all the information it asked for. Kuiper was able to go out to the sites several times, took all the notes and pictures that he wanted, and interviewed Pankratz. We find no sign that Pankratz withheld any information from BDO.

[*35] Pankratz also relied on BDO's advice. Casey Peterson took depreciation deductions based on BDO's draft report that had already been peer reviewed. This same report became a tax opinion--meaning that it could undoubtedly be relied on for tax purposes--in 2010. The Commissioner argues that this delay in finalizing the report means that Pankratz's reliance couldn't be in good faith, because he was relying on only a draft. Treating this report as "just" a draft is misleading as there were no significant changes--nor were any expected--from the report Pankratz relied on and the tax opinion BDO finalized in 2010.

We find Pankratz's reliance on BDO's tax advice to have been reasonable and in good faith. It immunizes him against section 6662 penalties related to the depreciation deductions that he took in reliance on BDO's studies.

### 4. Business Expenses

The next group of disallowed deductions are what Pankratz claimed were ordinary and necessary expenses for several of his businesses. He conceded some of these deductions in the to-and-fro of settlement discussions, but says that he claimed them on his returns in good faith and that at most they were bookkeeping mistakes. He argues that the occasional bookkeeping error should not lead to an accuracy-related penalty if a taxpayer has a good bookkeeping system in place. Pankratz argues that he did.

[*36] We have to ask at the start of this discussion how reliance on bookkeepers fits into section 6664's defenses. There are at least some cases that analogize bookkeepers to more obviously professional tax advisers, like CPAs or lawyers. When we do this, we apply the usual Neonatalogy test and look for professional competence, provision of information, and reasonable reliance on advice in good faith. See, e.g., Isaacs v. Commissioner, T.C. Memo. 2015-121, 109 T.C.M. (CCH) 1624, 1640 (2015). Then there are the cases where we trace underpayments on returns to faulty bookkeeping and ask whether the taxpayer was reasonable and acted in good faith in relying on his bookkeeper or the system of bookkeeping that he set up. See, e.g., Bigler v. Commissioner, T.C. Memo. 2008-133, 95 T.C.M. (CCH) 1525, 1528 (2008).

The regulation tells us by way of example that "erroneous information * * * inadvertently included in data compiled by the various divisions of a multidivisional corporation or in financial books and records prepared by those divisions generally indicates reasonable cause and good faith, provided the corporation employed internal controls and procedures, reasonable under the circumstances." Sec. 1.6664-4(b)(1), Income Tax Regs. Pankratz is, in these cases, not arguing so much that his bookkeepers gave him sound advice, but that they kept his business and tax records in ways that were reasonable under the

[*37] circumstances and designed to identify and correct any problems.  We therefore think it makes sense to address the penalties related to these businesses by how the books were kept--and more importantly, who kept them.  This leads us to three groupings:  businesses for which Casey Peterson performed the bookkeeping, businesses for which Horning performed the bookkeeping, and businesses for which Elaine Nash performed the bookkeeping.  Though Meier reviewed the returns, he didn't check to make sure the bookkeeping was properly done--rather he looked at the already prepared working papers for review.  This distinguishes Pankratz's cases from Embroidery Express, LLC v. Commissioner, T.C. Memo. 2016-136, 112 T.C.M. (CCH) 76 (2016), where a CPA actually reviewed the bookkeeping records and made corresponding adjustments to the financial statements.

i.     Casey Peterson.

Casey Peterson, and more specifically Gerlach, performed the full bookkeeping function[12] for many of Pankratz's businesses.  Gerlach is a licensed CPA at a reputable firm.  She was able to go to the worksites once or twice a

---

[12] We note that Casey Peterson performed some less-than-full-time bookkeeping services (such as payroll) for several additional businesses.  Our analysis does not apply to these businesses because Casey Peterson didn't provide full bookkeeping services for them.

[*38] week. She paid the bills and reconciled bank accounts. In preparing the general ledgers of these businesses, she recorded expenses according to the invoices received. With very few exceptions, Gerlach never recorded an expense without an invoice. And if something in the invoices didn't look right, Gerlach was able to follow up with a manager.

We think it important to note that some of the Commissioner's disallowances stemmed from his disagreement with Pankratz on how he grouped his enterprises on different Schedules C rather than the amounts he deducted. We never had to resolve this question because of the parties' settlement. We do recognize that this issue is not an easy one in most circumstances and Pankratz's reporting position--reporting each of his LLCs on separate Schedules C and his farm and ranching operations on Schedules F--doesn't seem at all unreasonable and neither party introduced any evidence that it was.

That left a number of items of expenses that the parties stipulated were not allowable. But it also led to an agreement that well more than $10 million in expenses were allowable. Apart from the charitable-contribution deductions, none of the conceded disallowable expenses were very large compared to the vast number and amount of allowable expenses. We find especially persuasive the credible evidence that Pankratz retained Casey Peterson precisely because he

[*39] realized by 2008 that the mysterious "Sue" might have been the source of his earlier bookkeeping problems for his hodgepodge of different businesses. We find it more likely than not that Pankratz relied in good faith on the bookkeeping for these businesses. Though there were errors in the bookkeeping, these errors were reasonable given the number of expenses. Neither these errors nor Pankratz's reliance on Casey Peterson's bookkeeping was made in bad faith. We find that no penalties should apply to the incorrect deduction of business expenses for these businesses.

### ii.    Jim Horning

The next group of businesses are those for which Horning did the bookkeeping. As we've already discussed, Horning did not have the expertise to make reliance on him for the deductibility of noncash-charitable contributions reasonable. But we also believe that Pankratz's reliance on him to keep the books on the ranching businesses was reasonable, because Horning had been keeping these records competently for several years.[13]

---

[13] Pankratz also points us to Embroidery Express, 112 T.C.M. (CCH) at 76, to show that reliance on Horning for bookkeeping was reasonable. In Embroidery, a taxpayer hired a full-time bookkeeper (who was not a CPA) to perform the bookkeeping function for the business. See id. at 94. However, the taxpayer there also hired a CPA, who had been licensed for 31 years and previously prepared its returns for 19 years, to review its bookkeeper's records and prepare the returns.

(continued...)

**[\*40]**                    iii.    <u>Elaine Nash</u>

The last bookkeeper was Elaine Nash, who did the bookkeeping for LaGrand Station and Keystone Convenience.  We reiterate that the burden is on Pankratz to show it was reasonable to rely on Nash as bookkeeper, because the taxpayer has the burden of proof under section 6664.  <u>See</u> Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933); <u>Cohan v. Commissioner</u>, T.C. Memo. 2012-8, 103 T.C.M. (CCH) 1037, 1065 (2012).  All we know about Nash is that Pankratz believed her to be a "great bookkeeper."  But we don't know anything about her experience, her education, or her bookkeeping methods.  We have nothing aside from Pankratz's word (and we do mean one word--"great") with which to determine whether Nash was a qualified, competent bookkeeper.  And there is nothing in the record to show that Nash's work was reviewed by any more obviously qualified tax professional as occurred in <u>Embroidery Express</u>.  Penalties therefore apply to any erroneous deductions taken for businesses where Nash did the bookkeeping.

---

[13](...continued)
<u>See</u> <u>id.</u>  That was not the case here.

**[\*41]** These decisions will require some calculation by the parties so

<u>Decisions will be entered under</u>

<u>Rule 155</u>.